# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

———————————————

## Case No. 22-13658

———————————————

**BURTON W. WIAND, as Receiver for Oasis International Group, Limited, Oasis Management, LLC, and Satellite Holdings Company,**

**Appellant,**

**v.**

**ATC BROKERS LTD., DAVID MANOUKIAN, and SPOTEX LLC,**

**Appellees.**

———————————————————————

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

———————————————————————

## INITIAL BRIEF OF APPELLANT
## BURTON W. WIAND, AS RECEIVER

———————————————————————

Jared J. Perez, FBN 0085192
Jared.Perez@JaredPerezLaw.com
Jared J. Perez P.A.
301 Druid Road West
Clearwater, FL 33756
Tel.: (727) 641-6562
Fax: (727) 205-9929

Sallah Astarita & Cox, LLC
3010 N. Military Trail, Suite 210
Boca Raton, FL 33431
Tel.: (561) 989-9080
Fax: (561) 989-9020

*Attorneys for Appellant/Receiver,*
*Burton W. Wiand*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant, Burton W. Wiand, as Receiver (the "**Appellant**" or "**Receiver**"), by and through his undersigned counsel and pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, submits this Certificate of Interested Persons and Corporate Disclosure Statement, which includes the trial judge, and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal:

1. 444 Gulf of Mexico Drive, LLC, *Entity in Receivership*

2. 4064 Founders Club Drive, LLC, *Entity in Receivership*

3. 6922 Lacantera Circle, LLC, *Entity in Receivership*

4. 13313 Lost Key Place, LLC, *Entity in Receivership*

5. 4OAKS LLC, *Entity in Receivership*

6. Adams, Matthew S., *Counsel for Defendant/Appellee Spotex LLC*

7. Anile, Joseph S., II, *Defendant in underlying Regulatory Action*

8. ATC Brokers Ltd, *Defendant/Appellee*

9. Bowling Green Capital Management, LLC, *Entity in Receivership*

10. Commodity Futures Trading Commission, *Plaintiff in underlying Regulatory Action*

11. DaCorta, Michael J., *Defendant in underlying Regulatory Action*

12. DeMaria, Joseph A., *Counsel for Defendant/Appellee Spotex LLC*

13. Duran, Francisco ("Frank") L., *Defendant in underlying Regulatory Action*

14. Eldgidely, Robert F., *Counsel for Defendant/Appellee Spotex LLC*

15. Fox Rothschild, LLP, *Counsel for Defendant/Appellee Spotex LLC*

16. Greenberg Traurig, P.A., *Counsel for Defendants/Appellees ATC Brokers Ltd. and David Manoukian*

17. Guerra King P.A., *Counsel for Plaintiff/Appellant Burton Wiand*

18. Haas, John J., *Defendant in underlying Regulatory Action*

19. Hernandez-Covington, Hon. Virginia, *U.S. District Court Judge*

20. Jared J. Perez P.A., *Counsel for Plaintiff/Appellant Burton Wiand*

21. Katz, Joshua A., *Counsel for Plaintiff/Appellant Burton Wiand*

22. Kehoe, Greg, Counsel for *Defendants/Appellees* ATC Brokers Ltd. and David Manoukian

23. Kingman, Marissa Koblitz, *Defendant/Appellee Counsel for Spotex LLC*

24. Lagoon Investments, Inc., *Entity in Receivership*

25. Manoukian, David, *Defendant/Appellee*

26. Montie, Raymond P., III, *Defendant in underlying Regulatory Action*

27. Oasis International Group, Limited, *Entity in Receivership*

28. Oasis Global FX, Limited, *Entity in Receivership*

29. Oasis Global FX, S.A., *Entity in Receivership*

30. Oasis Global (Nevis) Limited, *Entity in Receivership*

31. Oasis Management, LLC, *Entity in Receivership*

32. Perez, Jared J., *Counsel for Plaintiff/Appellant Burton Wiand*

33. Rengstl, Patrick J., *Counsel for Plaintiff/Appellant Burton Wiand*

34. Roar of the Lion Fitness, LLC, *Entity in Receivership*

35. Sallah Astarita & Cox, LLC, *Counsel for Plaintiff/Appellant Burton Wiand*

36. Sallah, James D., *Counsel for Plaintiff/Appellant Burton Wiand*

37. Satellite Holdings Company, *Entity in Receivership*

38. Scriven, Hon. Mary Stenson, *U.S. District Court Judge*

39. Spotex LLC, *Defendant/Appellee*

40. Torres, Christopher, *Counsel for Defendants/Appellees ATC Brokers Ltd. and David Manoukian*

41. White, Christopher R., *Counsel for Defendants/Appellees ATC Brokers Ltd. and David Manoukian*

42. Wiand, Burton W., *Receiver*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Burton W. Wiand, as Receiver, requests oral argument, as the District Court's decision contradicts the important, well-recognized ability of federal equity receivers to recover fraudulent transfers made from Ponzi schemes. It also inhibits the ability of receivers to assert tort claims against wrongdoers that aid and abet fraudulent schemes. Finally, in a significant expansion of the Community Decency Act and governing law, the District Court's decision grants statutory immunity to a company that makes software to facilitate the trading of foreign currencies. None of these decisions should withstand this Court's review.

# **TABLE OF CONTENTS**

Table of Citations…………………………………………………………………vii

Subject Matter and Appellate Jurisdiction………………………………………xiii

Issues Presented……………………………………………………………......xiv

Statement of the Case……………………………………………………………1

Summary of the Argument…………………………………………………..11

Argument…...……………………………………………………………………..14

I.    THE RECEIVER HAS STANDING TO ASSERT FRAUDULENT TRANSFER CLAIMS UNDER FUFTA……………………………………14

     A.   Courts Universally Recognize A Receiver's Standing To Recover Fraudulent Transfers On Behalf Of Injured Receivership Entities. .... 15

     B.   The District Court Ignored This Court's Binding Precedent From *Lee*, *Dancing $*, and *Isaiah*..................................................................... 21

     C.   The Prior Precedent Rule Requires Reversal Of The Order. ................ 24

II.   THE IN PARI DELICTO AFFIRMATIVE DEFENSE DOES NOT BAR THE RECEIVER'S CLAIMS AGAINST ANY DEFENDANT....................25

     A.   The District Court Cannot (As It Did) Assert *Sua Sponte* An Affirmative Defense On Behalf Of A Defendant. ................................... 27

     B.   The Complaint Alleges The Existence Of Innocent Stockholders, Which Defeats The *In Pari Delicto* Defense. .......................................... 28

     C.   If Remanded, The Receiver Will Amend The Complaint To Include A Wide Variety Of "Honest Persons."........................................................... 33

     D.   Given Disputed Facts Regarding Innocent Stakeholders, The District Court's Application of The *In Pari Delicto* Affirmative Defense Was Premature. ....................................................................................... 38

III.  SPOTEX IS NOT ENTITLED TO STATUTORY IMMUNITY UNDER THE COMMUNITY DECENCY ACT....................................................................39

     A.     Spotex Is Not An Interactive Computer Service Or Access Service
            Provider. ............................................................................................ 40

     B.     Spotex Is Not A Publisher Or Speaker Of Information......................... 44

     C.     Spotex Was The Information Content Provider; It Automated False
            Account Records. ................................................................................ 46

IV.  THE DISTRICT COURT ABUSED ITS DISCRETION BY DISMISSING
     THE COMPLAINT WITH PREJUDICE ......................................................49

CONCLUSION……………………………………………………………...51

CERTIFICATE OF COMPLIANCE…………………………………………...52

CERTIFICATE OF SERVICE………………………………………………….53

# TABLE OF CITATIONS

## Cases

*Armstrong v. Collins*, 2010 WL 1141158, *33 (S.D.N.Y. 2010)…………………20

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009) ...............................44

*Cargill v. Turpin*, 120 F.3d 1366, 1386 (11th Cir. 1997)......................................24

*Commodity Futures Trading Commission v. Oasis International Group, Limited, et al.,* Case No. 8:19-cv00886-VMC-SPF (M.D. Fla.) ...........................................10

*Donell v. Kowell*, 533 F.3d 762, 777 (9th Cir. 2008) ............................................20

*Dyroff v. Ultimate Software Group, Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019).....40

*Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019)…………………………46

*F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1196 (10th Cir. 2009) ........................39

*F.T.C. v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016) ....................... 39, 40

*Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543 (Fla. 2d DCA 2003) ...................................................................................................................... Passim*

*Freeman v. First Union Nat. Bank*, 865 So. 2d 1272, 1277 (Fla. 2004) ................23

*Goldberg v. Chong*, 2007 WL 2028792, *4 (S.D. Fla. 2011) ................................18

*Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021), *cert. granted*, 214 L. Ed. 2d 12, 143 S. Ct. 80 (2022), and *cert. granted sub nom. Twitter, Inc. v. Taamneh*, 214 L. Ed. 2d 12, 143 S. Ct. 81 (2022)……………………………………………46

*Hays v. Paul, Hastings, Janofsky & Walker LLP*, 2006 WL 4448809, at \*10 (N.D. Ga. Sept. 14, 2006) ............................................................................38

*Hecht v. Malvern Prep. Sch.*, 716 F. Supp. 2d 395, 402 (E.D. Pa. 2010)………...20

*Herrick v. Grindr, LLC,* 306 F. Supp. 3d 579, 588 (S.D.N.Y. 2018), aff'd, 765 F. App'x 586 (2d Cir. 2019)………………………………………………………45

*In re Burton Wiand Receivership Cases*, 2008 WL 818504, at \*9 (M.D. Fla. Mar. 26, 2008) ................................................................................................23

*In re Mirabilis Ventures, Inc.*, 2011 WL 397788, at \*3 (M.D. Fla. Feb. 1, 2011)..30

*In re Wiand*, 2007 WL 963165, at \*7 (M.D. Fla. Mar. 27, 2007) .................... 26, 30

*Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296 (11th Cir. 2020) ............... Passim\*

*Janvey v. Brown*, 767 F.3d 430, 437 (5th Cir. 2014)................................................20

*Janvey v. Democratic Senatorial Campaign Comm., Inc*., 712 F.3d 185, 190 (5th Cir. 2013)..........................................................................................19

*KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1266 (11th Cir. 2006) .....11

*Klein v. Cornelius*, 786 F.3d 1310, 1316 (10th Cir. 2015)......................................20

*Knauer v. Jonathon Roberts Fin. Grp., Inc.*, 348 F.3d 230, 236 (7th Cir. 2003)....23

*Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1240 (11th Cir. 2010)....................27

*Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021)...................................... 39, 44

*Lindvall v. Richmond*, 2015 WL 12791483, at \*5 (S.D. Fla. June 24, 2015)……..18

*Marwil v. Farah*, 2003 WL 23095657, at \*7 (S.D. Ind. 2003)……………….....20

*Miller v. Harding*, 248 F.3d 1127, *1 (1st Cir. 2000) ............................................19

*Moecker v. Bank of Am., N.A.*, 2013 WL 12159056, at *3 (M.D. Fla. Oct. 21, 2013)

.................................................................................................. 21, 39

*National Coalition on Black Civic Participation v. Wohl*, 2021 WL 4254802, at *6

(S.D.N.Y. Sept. 17, 2021) ...................................................................40

*O'Halloran v. PricewaterhouseCoopers LLP,* 969 So. 2d 1039 (Fla. 2d DCA 2007)

.................................................................................................. 26, 29

*Obermaier v. Arnett*, 2002 WL 31654535, at *3 (M.D. Fla. Nov. 20, 2002)..........19

*Off. Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1149-

50 (11th Cir. 2006) .................................................................................26

*Pearlman v. Alexis*, 2009 WL 3161830, at *3 (S.D. Fla. Sept. 25, 2009)...............38

*Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011)...........................................34

*Perlman v. Bank of Am., N.A.*, 2014 WL 12279513, at *4 (S.D. Fla. Sept. 19, 2014)

.................................................................................................................26

*Perlman v. PNC Bank, N.A.*, 38 F.4th 899, 904 (11th Cir. 2022) ...........................30

*Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 996 (11th Cir. 2014).......49

*Perlman v. Vairog US, LLC*, 2021 WL 9426826, at *4 (S.D. Fla. Mar. 9, 2021)...49

*Quilling v. Grand St. Trust*, 2005 WL 1983879, at *6 (W.D.N.C. 2005)………...20

*Roberts v. Gordy*, 877 F.3d 1024, 1028 (11th Cir. 2017).......................................27

*S.E.C. v. Cook*, 2001 WL 256172, *2 (N.D. Tex. 2001)………………………20

ix

*S.E.C. v. Forte*, 2012 WL 1719145, *7 (E.D. Pa. 2012)…………………………20

*S.E.C. v. Shiv*, 379 F. Supp. 2d 609, 618 (S.D.N.Y. 2005)………………………20

*S.E.C. v. Vescor Capital Corp.*, 599 F.3d 1189, 1197 (10th Cir. 2010)..................50

*Sale v. Ferrari Fin. Servs., Inc.*, 2020 WL 5750502, at *4 (S.D. Fla. Sept. 25, 2020) ........................................................................................................18

*Sale v. Jumbleberry Enterprises USA, Ltd.*, 2021 WL 7542953, at *4 (S.D. Fla. June 18, 2021)..............................................................................................18

*Sallah ex rel. MRT LLC v. Worldwide Clearing LLC*, 860 F. Supp. 2d 1329, 1334-35 (S.D. Fla. 2011) ..............................................................................18

*Sallah v. Fahrenheit Venture Fund LLC*, 2014 WL 12629450, at *7 (S.D. Fla. Sept. 5, 2014)........................................................................... 26, 30

*Scholes v. African Enter., Inc.*, 838 F. Supp. 349, 356 (N.D. Ill. 1993)…………..20

*Scholes v. Lehmann,* 56 F.3d 750 (7th Cir.1995) ............................. 11, 15, 16, 22*

*Stenger v. World Harvest Church, Inc.*, 2006 WL 870310, at *4-5 (N.D. Ga. Mar. 31, 2006)..............................................................................................18

*Thomas v. Farmville Mfg. Co.*, 705 F.2d 1307 (11th Cir. 1983)..................... 11, 49

*United States of America v. Joseph S. Anile, II*, Case No. 8:19-cr-334-T-35CPT (M.D. Fla.) ..............................................................................................2

*United States of America v. Michael J. DaCorta*, Case No. 8:19-cr-605-T-02CPT (M.D. Fla.) ..............................................................................................2

*United States v. Steele*, 147 F.3d 1316, 1317-18 (11th Cir. 1998) .........................24

*United States v. Woodard,* 938 F.2d 1255, 1258 (11th Cir.1991), *cert. denied,* 502

U.S. 1109, 112 S.Ct. 1210, 117 L.Ed.2d 449 (1992) ..........................................24

*Vyas v. Polsinelli PC*, 2022 WL 1568405, at *3 (M.D. Fla. May 18, 2022) .........38

*Warfield v. Byron*, 436 F.3d 551, 554 (5th Cir. 2006)............................................19

*Whitney Info. Network, Inc. v. Verio, Inc.,* 2006 WL 66724, at *2 (M.D. Fla. Jan.

11, 2006) .................................................................................................................39

*Wiand v. Dancing $, LLC,* 578 F. App'x 938 (11th Cir. 2014).....................Passim*

*Wiand v. Lee*, 753 F.3d 1194 (11th Cir. 2014) ...........................................Passim*

*Wing v. Dockstader*, 482 Fed. Appx. 361, 363 (10th Cir. 2012)............................20

*Wing v. Hammons*, 2009 WL 1362389, *2-3 (D. Utah 2009)……………………..20

*Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169 (9th Cir. 2009) ................. 42, 43

**Statutes**

15 U.S.C. § 78aa………………………………………………………………….10

28 U.S.C. § 1367………………………………………………………………….10

28 U.S.C. §§ 754 and 1692………………………………………………………. 10

47 U.S.C. § 230(f)(4)……………………………………………………………41, 43

47 U.S.C. § 230(c) ...................................................................................................39

Fla. Stats. § 726.102(3)…………………………………………………………….17

Fla. Stats. § 726.105(1)(a)………………………………………………….3

Fla. Stats. § 726.105(1)(b)…………………………………………………3

Fla. Stats. § 726.106(1)……………………………………………………..3

Fla. Stats. §§ 726.101 *et seq*………………………………………………11

Fla. Stats. § 726.112...........................................................................................19

## **Other Authorities**

Restatement of Torts (2d) § 552(1)..................................................................45

## **Rules**

Federal Rule of Civil Procedure 15(a)(1)(B) ....................................................5

Federal Rule of Civil Procedure 12(b)(2) ........................................................5

Federal Rule of Civil Procedure 12(b)(6) ........................................................5

# SUBJECT MATTER AND APPELLATE JURISDICTION

This is a direct appeal from a civil case. On September 27, 2022, the United States District Court for the Middle District of Florida (the "**District Court**") issued an order dismissing with prejudice claims asserted by Burton W. Wiand, as Receiver (the "**Receiver**"), against ATC Brokers Ltd. ("**ATC**"), David Manoukian ("**Manoukian**"), and Spotex LLC ("**Spotex**"). Doc.[1] 67 (the "**Order**"). The District Court had subject matter jurisdiction pursuant to 15 U.S.C. § 78aa, 28 U.S.C. §§ 754 and 1692, and principles of ancillary or supplemental jurisdiction under 28 U.S.C. § 1367.

On October 26, 2022, the Receiver filed a notice of appeal (Doc. 68). Pursuant to pertinent law, the Receiver then moved for permission from the court in *Commodity Futures Trading Commission v. Oasis International Group, Limited, et al.,* Case No. 8:19-cv00886-VMC-SPF (M.D. Fla.) (the "**CFTC Action**" in the "**Receivership Court**") – the action in which the Receiver was appointed – to prosecute the appeal, and the supervising court granted the Receiver's motion. *See* CFTC Docs.[2] 698 (motion), 702 (order).

---

[1] "Doc." refers to the docket number of filings in the District Court in this case.

[2] "CFTC Doc." refers to the docket number of filings in the CFTC Action.

## ISSUES PRESENTED

1.    Does a federal equity receiver appointed in the wake of a Ponzi scheme's collapse have standing to assert claims under the Florida Uniform Fraudulent Transfer Act, Fla. Stats. §§ 726.101 *et seq*. ("**FUFTA**"), *Wiand v. Lee*, 753 F.3d 1194 (11th Cir. 2014), and *Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296 (11th Cir. 2020)?

2.    Are the Receiver's FUFTA claims subject to the "evil zombie" theory of standing from *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir.1995), under Florida law and this Court's decisions in *Lee* and *Isaiah*?

3.    With respect to common law tort claims, did the Receiver sufficiently allege at least one innocent stockholder or other honest person within the Receivership Entities to defeat the imputation of the principals' wrongdoing and the *in pari delicto* affirmative defense? If not, can the Receiver allege one such person if afforded an opportunity to amend on remand?

4.    Is Spotex, a company that makes private, customized financial services software to trade foreign currencies, an "interactive computer service" and "publisher" or "speaker" of information under the Community Decency Act?

5.    Did the District Court abuse its discretion by dismissing the Receiver's complaint with prejudice and without an opportunity to amend following issuance of the Order?

## STATEMENT OF THE CASE

### Relevant Procedural History

On April 15, 2019, the Commodity Futures Trading Commission ("**CFTC**") filed a complaint (Doc. 1) against (1) defendants Oasis International Group, Limited ("**OIG**"); Oasis Management, LLC ("**Oasis Management**"); Michael J. DaCorta ("**DaCorta**"); Joseph S. Anile, II ("**Anile**"); Francisco "Frank" L. Duran ("**Duran**"); Satellite Holdings Company ("**Satellite Holdings**"); John J. Haas ("**Haas**"); and Raymond P. Montie, III ("**Montie**") (collectively, the "**CFTC Defendants**") as well as certain relief defendants not relevant to this appeal. The Receiver brought this action on behalf of OIG, Oasis Management, and Satellite Holdings as well as Oasis Global FX, Limited and Oasis Global FX, S.A.[3] (collectively, the "**Receivership Entities**" or, generally, "**Oasis**").

April 15, 2019, the Court entered an order appointing Burton W. Wiand as temporary Receiver for the Receivership Entities (CFTC Doc. 7). The Court directed him, in relevant part, to "[t]ake exclusive custody, control, and possession of the Receivership Estate," which includes "all the funds, properties, premises, accounts, income, now or hereafter due or owing to the Receivership Defendants, and other assets directly or indirectly owned, beneficially or otherwise, by the Receivership Defendants." *See id*. at p. 14, ¶ 32 & p. 15, ¶ 30.b. Subsequently, all

---

[3] These subsidiaries of Receivership Entities are referred to as the "**Oasis Pools**."

1

defendants and relief defendants either defaulted or consented to the entry of a preliminary injunction against them (with some differences unique to the circumstances of each party).[4] *See* CFTC Docs. 35, 43, 44, 82, 85, 172, 174-77. On July 11, 2019, the Court entered a Consolidated Receivership Order, which is now the operative document governing the Receiver's activities. CFTC Doc. 177 (the "**Consolidated Order**").

Through the Consolidated Order, the Receivership Court also authorized the Receiver "to sue for and collect, recover, receive and take into possession all [r]eceivership [p]roperty," "bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver," "pursue … all suits, actions, claims, and demands, which may now be pending or which may be brought by … the [r]eceivership [e]states," and "prosecute" actions "of any kind as may in his discretion, and in consultation with the CFTC's counsel, be advisable or proper to

---

[4] In addition, on August 8, 2019, CFTC Defendant Anile pled guilty to three counts involving the scheme – (1) conspiracy to commit wire and mail fraud; (2) engaging in an illegal monetary transaction; and (3) filing a false income tax return. *See United States of America v. Joseph S. Anile, II*, Case No. 8:19-cr-334-T-35CPT (M.D. Fla.). Similarly, on December 17, 2019, a federal grand jury returned a two-count indictment against CFTC Defendant DaCorta, alleging conspiracy to commit wire and mail fraud as well as engaging in an illegal monetary transaction. *See United States of America v. Michael J. DaCorta*, Case No. 8:19-cr-605-T-02CPT (M.D. Fla.). On May 4, 2022, after two weeks of testimony and argument before the Honorable William F. Jung and less than four hours of deliberation, a jury found DaCorta guilty on all three counts. *Id.* Doc. 192. Importantly, CFTC Defendants Montie, Haas, and Duran have not been indicted.

recover and/or conserve [r]eceivership [p]roperty." *Id.*, ¶¶ 8.B, 8.I.; *see also* ¶ 8.J. (authorizing the Receiver to "pursue … all suits, actions, claims, and demands, which may now be pending or which may be brought by … the [r]eceivership [e]states"); ¶¶ 44, 2 (providing authority to "investigate the manner in which the financial and business affairs of the [r]eceivership [d]efendants were conducted" and pursue actions to recover assets that "were fraudulently transferred by the [d]efendants and/or [r]elief [d]efendants").

On April 23, 2021, the Receivership Court approved the engagement of Sallah Astarita & Cox, LLC to investigate and prosecute potential claims against ATC, Manoukian, and Spotex based on the Consolidated Order. *See* CFTC Docs. 177, 390. On May 28, 2021, the Receiver filed a complaint against ATC Brokers Ltd., David Manoukian, and Spotex LLC, asserting claims for (Count I) aiding and abetting fraud against all defendants; (Count II) aiding and abetting breaches of fiduciary duty against all defendants; (Count III) avoidance of fraudulent transfers against ATC under Fla. Stats. § 726.105(1)(a); (Count IV) avoidance of fraudulent transfers against ATC under Fla. Stats. § 726.105(1)(b); (Count V) avoidance of fraudulent transfers against ATC under Fla. Stats. § 726.106(1); (Count VI) gross negligence against all defendants; and (Count VII) simple negligence against all defendants.[5] *See* Doc. 1. The Receiver asserted fraudulent transfer claims only

---

[5] Fla. Stats. §§ 726.105(1)(a), 726.105(1)(b), and 726.106(1) are parts of FUFTA.

against ATC, and those claims represent approximately $22 million in value to the Receivership Estate.

On August 9, 2021, ATC and Manoukian, moved to dismiss the complaint. Docs. 24, 25. ATC argued only that the District Court lacked personal jurisdiction over the company. Doc. 24. The *in pari delicto* affirmative defense does not appear in ATC's motion.[6] *Id.* Manoukian similarly argued the Receiver lacks standing and personal jurisdiction to assert tort claims again him. Doc. 25. He also argued that he owed no duty to the Receivership Entities and lacked the requisite knowledge of wrongdoing, but again, the *in pari delicto* affirmative defense does not appear in the motion.

On August 20, 2021, Spotex filed a motion to dismiss and raised the same issues as ATC and Manoukian – *e.g.*, a purported lack of standing and personal jurisdiction to assert tort claims, the purported absence of any duty to the Receivership Entities and knowledge of wrongdoing, and other procedural matters. Doc. 32. Spotex also claimed immunity under the Community Decency Act ("**CDA**"). The *in pari delicto* affirmative defense does not appear in the motion.

---

[6] As explained below in Section II.A., this is important because a judge cannot *sua sponte* raise an unasserted affirmative defense on behalf of a defendant.

On September 24, 2021, the Receiver filed an amended complaint.[7] Doc. 36. In the amended complaint, the Receiver asserted the same claims against ATC, Manoukian, and Spotex as in the initial complaint. On October 22, 2021, ATC, Manoukian, and Spotex moved to dismiss the amended complaint.[8] Docs. 41, 42, 43. ATC moved to dismiss based <u>only</u> on a purported lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). *See* Doc. 43. Manoukian moved to dismiss under Rule 12(b)(6) for a purported lack of standing under *Isaiah*, and again for allegedly failing to plead requisite knowledge or acts by Manoukian that could support an action against him. Doc. 42. Spotex moved to dismiss for lack of standing under *Isaiah* and again for failure to state a cause of action for aiding and abetting and negligence as well as immunity under the CDA. Doc. 41. None of these motions mention the *in pari delicto* affirmative defense.

---

[7] Specifically, on August 25, 2021, the Receiver filed a motion for an extension of time to respond to the defendants' motions to dismiss. Doc. 33. The Receiver requested additional time to respond to the three lengthy motions or, in the alternative, to file an amended complaint. *Id.* This is relevant because, in the Order, the District Court treated the motion for an extension of time as a motion for leave to amend. *See* Order at 18 ("The Court, after having previously granted Plaintiff leave to amend his complaint, finds…."). Because the Receiver primarily requested an extension of time, the amended complaint should have been considered a pleading as a matter of course under Fed. R. Civ. P 15(a)(1)(B) in deciding whether to dismiss with prejudice. In any event, it is indisputable that the Receiver never had an opportunity to amend the complaint after reviewing the Order.

[8] Unless otherwise specified, the amended complaint is hereinafter referred to as the operative "**Complaint**" or "**Compl.**"

On September 27, 2022, the District Court dismissed the Complaint with prejudice, thereby denying the Receiver any opportunity to address the issues raised in the Order. Doc. 67.

On October 26, 2022, the Receiver filed a notice of appeal. Doc. 68. On December 22, 2022, the Receivership Court authorized the Receiver to prosecute the appeal. CFTC Doc. 702.

**Factual Background**[9]

OIG was a Cayman Islands limited corporation formed primarily by Anile, DaCorta, and Montie in or around March 2013. Compl. ¶ 14. OIG acted as a commodity pool operators by soliciting, receiving, and accepting funds from pool participants for investments in the Oasis Pools. *Id.* OIG was not registered with the CFTC in any capacity. *Id.* Like OIG, Oasis Management and Satellite Holdings acted as commodity pool operator by accepting and receiving funds from pool participants for the purpose of investing in the Oasis Pools. *Id*. ¶¶ 15, 16. They were also not registered with the CFTC in any capacity. *Id.*

From late 2013 to the Receiver's appointment in April 2019, the CFTC Defendants solicited more than 700 investors, the majority of whom were U.S.

---

[9] The Complaint contains 131 paragraphs of factual allegations, but the District Court never addressed the parties' arguments about personal jurisdiction and other matters like the defendant-appellees' knowledge of the scheme. As such, this section contains only a general overview of the scheme, their roles, and allegations relevant to standing.

residents, to invest more than $78 million in OIG, OM, and Satellite Holdings for purposes of investing in pooled investments in retail forex in two Oasis forex commodity pools – Oasis Pools 1 and 2. In reality, the CFTC Defendants operated the Oasis entities as a Ponzi scheme with OIG as the principal entity used to perpetrate the Ponzi scheme. *Id*. ¶ 50.

Over time, the CFTC Defendants raised funds from innocent investors through several forms of securities. For example, when OIG was formed, a portion of its common shares (less than 10% in total) was owned by at least six innocent and honest shareholders, meaning they were not aware of the CFTC Defendants' misconduct. As such, any misconduct on the part of any CFTC Defendant should not be imputed to OIG and the other Oasis entities. *Id*. ¶ 53.

The CFTC Defendants also began an offering to third party shareholders of a minimum of 100,000 and a maximum of 500,000 non-voting OIG preferred shares at $10 per share. These investments were memorialized in a Confidential Private Placement Memorandum. *Id*. ¶ 54. The private memorandum promised these shareholders a guaranteed minimum annual return or dividend of 12% from trading forex. All preferred shareholders regularly received quarterly preferred interest payments. *Id*. ¶ 55.

There were more than 60 preferred shareholders from 2013 through 2017. *Id*. ¶ 56. Nearly all of the preferred stock shareholders were innocent and honest,

meaning they were unaware of the CFTC Defendants' misconduct. *Id.* As such, any misconduct on the part of the individual CFTC Defendants should not be imputed to OIG and the other Oasis entities. *Id.*

After selling shares by means of the PPM, the CFTC Defendants continued offering OIG investments to third party investors through a Promissory Note and Loan Agreement. *Id.* ¶ 57. These investors were also innocent. *Id.* As such, any misconduct on the part of the individual CFTC Defendants should not be imputed to OIG and the other Oasis entities. *Id.*

### The Defendant-Appellees' Role in the Scheme

Manoukian is ATC's controlling principal, controlling executive, controlling director, and primary shareholder. *Id.* ¶ 24. Manoukian is also an owner of Spotex. *Id.* Manoukian personally managed almost all aspects of ATC's relationship with Oasis from California. *Id.* ¶ 26. Manoukian dealt directly with CFTC Defendants DaCorta and Anile, and as a result, Manoukian, ATC, and Spotex knew that DaCorta and Anile were failing to comply with governing rules and regulations and engaging in other wrongdoing. *Id.* They knew that the CFTC Defendants were not registered with the CFTC or any other appropriate agency (*id.* ¶¶ 58-62), and they knew that certain of the CFTC Defendants were making material misrepresentations and omissions to investors (*id.* ¶¶ 63-62). They ignored those facts and nevertheless provided substantial assistance to Receivership Entities.

Specifically, the Oasis entities could not engage in any forex transactions without a forex firm that would open forex accounts for them and provide them with liquidity to trade on leverage. *Id.* ¶ 74. ATC was a firm that provided these services, and Manoukian supervised and ultimately approved the ATC account applications for opening the subject ATC accounts for such services. *Id.* In addition, the Oasis entities could not engage in any forex transactions without a "white label" software suite that would support the Oasis entities and generate online account records with various back-office tasks. *Id.* ¶ 75. Two subsidiaries of Receivership Entities entered into agreements for ATC to provide this "white label" suite. *Id.* However, ATC did not provide these services and, instead, referred the Oasis entities to its affiliate, Spotex. *Id.* Given the derivative nature of ATC's relationship with Spotex, ATC's clients were also Spotex's clients. *Id.* ¶¶ 76, 77.

Manoukian, ATC, and Spotex knew that the CFTC Defendants and the Receivership Entities were unregistered and impermissibly soliciting investors located in the United States, but they nevertheless opened and "onboarded" trading accounts. *See id*. ¶¶ 78-92. They created an improper "omnibus" account, which allowed funds to be pooled and commingled. *Id.* ¶ 93-94. To continue earning generous commissions, the defendant-appellees accepted almost $22 million in deposits of investor money and either ignored or participated in numerous improprieties. *Id.* ¶¶ 95-104.

As mentioned above, Spotex provided DaCorta and Anile a "white label" software suite that would generate online account records. *Id.* ¶¶ 106-107. The software provided online account records for OIG investors regarding purported balances, purported trades, purported trading volume, and purported "spread pay" to be distributed as income among investors. *Id.* ¶ 108. These account records were presented to investors via a website that encouraged investors to place and keep their money with the Oasis entities with the hopes of continued income. *Id.* Unfortunately, the account records and other representations to investors were proven false. *Id.* ¶ 109.

The substantial technical assistance Spotex and the other defendants provided to the scheme is alleged in detail at paragraphs 110 through 131 of the Complaint, but their most important task was the automation of adjustments. DaCorta was losing millions of dollars trading, but he was simultaneously reporting significant gains to investors. *See generally* ¶¶ 116-129. To turn the losses into gains on account statements, DaCorta initially tasked an Oasis employee with making manual "adjustments." As the scheme grew, that process became cumbersome. Manoukian, ATC, and Spotex were asked to automate the adjustments, and they did so. *Id.* (including excerpts of contemporaneous emails) This allowed DaCorta to commit fraud at scale. By the time the CFTC halted the scheme in early 2019, DaCorta had lost approximately $20 million of the $22

million transferred to ATC, which understates the damage due to the use of leverage and numerous margin calls. *Id.* ¶¶ 92, 101, 104. Creditors of Receivership Entities have filed claims in the CFTC Action alleging losses of approximately $70 million. *See* CFTC Doc. 727. Those losses could not have been incurred without substantial assistance from Manoukian, ATC, and Spotex.

## Standard of Review

*De novo* review for legal error applies to the legal issues raised by this appeal, including whether the Receiver has standing, whether the in pari delicto affirmative defense applies to fraudulent transfer claims, whether the affirmative defense bars the Receiver's tort claims, especially at the motion to dismiss stage, and whether Spotex is entitled to immunity under the CDA. *See, e.g., KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1266 (11th Cir. 2006). Abuse of discretion review applies to District Court's decision to dismiss the Receiver's claims with prejudice, thereby denying any opportunity to amend. *Thomas v. Farmville Mfg. Co.*, 705 F.2d 1307, 1307 (11th Cir. 1983).

## SUMMARY OF THE ARGUMENT

This appeal raises three primary arguments. First, under Florida law and this Court's decision in *Wiand v. Lee,* 753 F.3d 1194 (11th Cir. 2014), the Receiver has "evil zombie" standing to assert fraudulent transfer claims against ATC regardless of the innocence or honesty of any affiliated person. As explained below in

Section I, *Lee* is binding precedent under this Circuit's prior panel rule, and the District Court erred by ignoring that case and misapplying other relevant authorities. Specifically, the District Court failed to differentiate fraudulent transfer claims, through which receivers seek the return of receivership property, and common law tort claims, through which receivers attempt to hold third parties liable for damages to receivership entities. Since *Lee*, this Circuit has been clear that receivers have standing to assert fraudulent transfer claims. Numerous other courts agree.

Second, common law tort claims, on the other hand, are subject to additional hurdles. Under Florida law and this Court's decision in *Isaiah v. JPMorgan Chase Bank*, receivers must allege the existence of at least one "innocent stockholder" or other honest person within the pertinent receivership entity to avoid imputation and defeat the *in pari delicto* affirmative defense. As explained below in Section II, the District Court's application of *Isaiah* to the facts of this case was internally inconsistent, contradictory, and wrong. The Receiver has sufficiently pled his common law tort claims against all defendants. If this Court determines otherwise, the Receiver should be granted leave to amend, and on remand, he will add numerous additional facts more than sufficient to satisfy *Isaiah* and Florida law.

Third, Spotex is not entitled to immunity under the CDA. As explained below in Section III, Spotex is not an interactive computer service or access

service provider. Expanding those terms to encompass Spotex's activities would bring almost every form of software within the CDA's ambit. Spotex is also not a publisher or speaker. As alleged in the Complaint, Oasis was the publisher of false account statements to investors through its website. Importantly, Spotex never claimed it was a publisher or speaker, and the District Court never made any such express determination. Instead, the District Court *sua sponte* and improperly raised an element of this affirmative defense on its behalf, claiming that Spotex is "related" to a publisher or speaker and being punished "as if" it was a publisher or speaker. That is insufficient. Finally, Spotex was an information provider because it automated the fraudulent adjustments. If Spotex fails to establish any element of its defense, it is not entitled to immunity, especially at the motion to dismiss stage.

Finally, the Court should reverse the Order and remand this case for further proceedings and trial. The District Court essentially dismissed an extremely detailed Complaint under Federal Rule of Civil Procedure 8 based on two unpled affirmative defenses with prejudice and without an opportunity to address the issues raised in the Order. If the Court affirms any part of the Order, justice requires that the Receiver be afforded an opportunity to address the pertinent issue(s) through amendment.

# ARGUMENT

## I. THE RECEIVER HAS STANDING TO ASSERT FRAUDULENT TRANSFER CLAIMS UNDER FUFTA

As noted above in the Procedural Background, the Receiver asserted <u>both</u> common law tort claims and statutory FUFTA claims against ATC but did not assert fraudulent transfer claims against either Spotex or Manoukian. In its motion to dismiss, ATC only argued the District Court lacked personal jurisdiction. The District Court never addressed this argument, however, and the word "transfer" does not appear anywhere in the Order. Instead, the District Court apparently dismissed the Receiver's fraudulent transfer claims against ATC for lack of standing. Order at 29 ("Having determined that Plaintiff lacks standing, the Court does not reach the [*sic*] ATC's personal jurisdiction arguments."). This portion of the Order was erroneous because the District Court could not rely on its denial of the Receiver's standing to assert tort claims (which was likewise erroneous, as discussed below in Section II) to hold that the Receiver lacked standing to bring fraudulent transfer claims. *See Isaiah*, 960 F.3d at 1306 (stating "the receiver for the corporation has standing to sue the recipients of fraudulent transfers" but denying standing to bring tort claims "unless the corporation has at least one honest member of the board of directors or an innocent stockholder") (citing *Freeman v. Dean Witter Reynolds, Inc.*, 865 So.2d 543, 550 (Fla. 2d DCA 2003) and *Lee*, 753 F.3d at 1203).

In other words, the District Court dismissed FUFTA claims against ATC worth approximately $22 million with prejudice but without analysis. For that reason alone, the Court should reverse the Order and remand this action. As explained below, the Court should also reverse the Order because (A) courts universally recognize a receiver's standing to recover fraudulent transfers on behalf of injured receivership entities; (B) the District Court ignored this Court's binding precedent from *Lee*, *Wiand v. Dancing $, LLC,* 578 F. App'x 938, 945 (11th Cir. 2014), and *Isaiah*; and (C) the prior precedent rule requires reversal of the Order.

### A. Courts Universally Recognize A Receiver's Standing To Recover Fraudulent Transfers On Behalf Of Injured Receivership Entities.

In *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir.1995), Judge Posner, writing for the Seventh Circuit, explained why federal equity receivers have standing to recover fraudulent transfers on behalf of injured receivership entities:

> Though injured by Douglas [*i.e.*, the perpetrator of the fraudulent scheme], the corporations would not be heard to complain as long as they were controlled by him, not only because he would not permit them to complain but also because of their deep, their utter, complicity in Douglas's fraud….

> But … the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors. That reason falls out now that Douglas has been ousted from control of and beneficial interest in the corporations. The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more Douglas's evil zombies. Freed from his

spell they became entitled to the return of the moneys—for the benefit not of Douglas but of innocent investors—that Douglas had made the corporations divert to unauthorized purposes. That the return would benefit the limited partners is just to say that anything that helps a corporation helps those who have claims against its assets. The important thing is that the limited partners were not complicit in Douglas's fraud; they were its victims.

Put differently, the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated. Now that the corporations created and initially controlled by Douglas are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors, we cannot see an objection to the receiver's bringing suit to recover corporate assets unlawfully dissipated by Douglas. We cannot see any legal objection and we particularly cannot see any practical objection.

*Id.* 754-55. As explained below, numerous courts have adopted some version of this "evil zombie" theory of standing when federal equity receivers sue to recover fraudulent transfers from receivership entities.

In *Wiand v. Lee*, this Court discussed and expressly adopted the Seventh Circuit's reasoning in *Scholes*:

First, an explanation of how the Receiver has standing to sue also explains how the receivership entities are creditors of Nadel for the transfers he made in perpetrating the Ponzi scheme. Judge Posner, in the leading case on the issue, addressed a receiver's standing to sue in a clawback action related to a Ponzi scheme in *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir.1995). A receiver of entities used to perpetrate a Ponzi scheme does not have standing to sue on behalf of the defrauded investors but does have standing to sue on behalf of the corporations that were injured by the Ponzi scheme operator. 56 F.3d at 753–55. Although the corporations constitute the "robotic tools" used by the Ponzi operator, they are "nevertheless in the eyes of the law separate legal entities with rights and duties." *Id.* at 754. The money they receive from investors should be used for their stated

16

purpose of investing in securities, and thus the corporations are harmed when assets are transferred for an unauthorized purpose to the detriment of the defrauded investors, who are tort creditors of the corporations. *Id.* Although the corporations participate in the fraudulent transfers, <u>once the Ponzi schemer is removed and the receiver is appointed, the receivership entities are no more the "evil zombies" of the Ponzi operator but are "[f]reed from his spell" and become entitled to the return of the money diverted for unauthorized purposes.</u> *Id.*

Under *Lehmann,* the Receiver has standing to sue on behalf of the receivership entities because they were harmed by Nadel when he transferred profits to investors, such as the Lee Defendants, from the principal investments of others for the unauthorized purpose of continuing the Ponzi scheme. Although the receivership entities were the instruments of Nadel's fraud, they were distinct legal entities whose purpose was to use client funds to invest in securities, and they were harmed when Nadel diverted the funds for unauthorized uses. Applying *Lehmann* to FUFTA, the receivership entities became "creditors" of Nadel at the time he made the transfers of profits to Lee and others because, as FUFTA requires, they had a "claim" against Nadel. They had a "claim" against Nadel because he harmed the corporations by transferring assets rightfully belonging to the corporations and their investors in breach of his fiduciary duties, and a "claim" under FUFTA includes "any right to payment" including a contingent, legal, or equitable right to payment. Fla. Stat. § 726.102(3). The receivership entities were thus creditors because they had a right to a return of the funds Nadel transferred for unauthorized purposes for the benefit of their innocent investors. *See Lehmann,* 56 F.3d at 754. <u>The Receiver's claim thus fits within the statutory language of FUFTA</u>, which requires the existence of a creditor and a debtor.

753 F.3d at 1202–03 (emphasis added; footnote and citation omitted); *see also Dancing $,* 578 F. App'x at 945[10] ("We must follow *Lee* and affirm the District Court's grant of summary judgment to the Receiver in Dancing $'s case as well."); *Isaiah,* 960 F.3d at 1306 ("[W]e held [in *Lee*] that the receiver for the corporation has standing to sue the recipients of fraudulent transfers under … FUFTA."); *Sale v. Jumbleberry Enterprises USA, Ltd.*, 2021 WL 7542953, at *4 (S.D. Fla. June 18, 2021) (discussing *Lee* and the "'evil zombie' doctrine"); *Sale v. Ferrari Fin. Servs., Inc.*, 2020 WL 5750502, at *4 (S.D. Fla. Sept. 25, 2020) ("as explained in *Wiand v. Lee*, the Receiver has standing to bring FUFTA claims"); *Sallah ex rel. MRT LLC v. Worldwide Clearing LLC*, 860 F. Supp. 2d 1329, 1334-35 (S.D. Fla. 2011) (holding receiver had standing to assert FUFTA claims because "after a corporation has been placed into receivership, it becomes a creditor with respect to assets which were fraudulently transferred away"); *Goldberg v. Chong*, 2007 WL 2028792, *4 (S.D. Fla. 2011) ("In sum, TEGFI, as a creditor alleging a claim against a debtor, has standing to bring a FUFTA claim against [d]efendants. The Receiver, having been so authorized by the Court, has standing to assert claims on TEGFI's behalf."); *Stenger v. World Harvest Church, Inc.*, 2006 WL 870310, at *4-5 (N.D. Ga. Mar. 31, 2006) (granting summary judgment for receiver on

_____

[10] *Lindvall v. Richmond*, 2015 WL 12791483, at *5 (S.D. Fla. June 24, 2015) (citing *Lee* and *Dancing $* to explain that "FUFTA has allowed broad and non-traditional standing … to challenge fraudulent conveyances").

fraudulent transfer claim after determining receiver had standing); *Obermaier v. Arnett*, 2002 WL 31654535, at *3 (M.D. Fla. Nov. 20, 2002) (receiver "clearly has standing to bring claims if the causes of action attempt to redress injuries to the Receivership Entities").

Like the Eleventh Circuit in *Lee*, courts throughout the country have held that receivers have standing to assert fraudulent transfer claims under state law based on the "evil zombie" theory from *Scholes* or similar reasoning. Other jurisdictions' decisions are particularly relevant because FUFTA must be "applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of [FUFTA] . . . among states enacting it." Fla. Stats. § 726.112. *See, e.g., Miller v. Harding*, 248 F.3d 1127, *1 (1st Cir. 2000) (noting claim to recover "fraudulent conveyance from the [Ponzi] corporation … belonged to the receiver" because "[a]n equity receiver, like a bankruptcy trustee, has standing for all claims that would belong to the entity in receivership"); *Warfield v. Byron*, 436 F.3d 551, 554 (5th Cir. 2006) (affirming summary judgment against investor-defendants who received transfers from limited liability corporation where Ponzi perpetrators "operated [the LLC] and related entities as a fraudulent Ponzi scheme"); *Janvey v. Democratic Senatorial Campaign Comm., Inc*., 712 F.3d 185, 190 (5th Cir. 2013) ("[W]e conclude that the Receiver has standing to assert the claims of SIBL, and any other Stanford entity in receivership, against the

Committees to recover the contributions made to them without reasonably equivalent value by the Stanford Ponzi operation."); *Janvey v. Brown*, 767 F.3d 430, 437 (5th Cir. 2014) ("[W]e hold that the Receiver has standing…."); *Donell v. Kowell*, 533 F.3d 762, 777 (9th Cir. 2008) ("The Receiver has standing to bring this suit because … the Receiver is in fact suing to redress injuries that [Ponzi entity] suffered when its managers caused [Ponzi entity] to commit waste and fraud."); *Wing v. Dockstader*, 482 Fed. Appx. 361, 363 (10th Cir. 2012) (under UFTA, "a receiver of an entity which was used to perpetrate a Ponzi scheme has standing to recover fraudulent transfers as though the receiver were a creditor of the scheme"); *Klein v. Cornelius*, 786 F.3d 1310, 1316 (10th Cir. 2015) ("[A] business entity abused by a Ponzi scheme qualifies as a defrauded creditor.").[11] Put simply, when an individual operates a Ponzi scheme through entities and makes fraudulent transfers to third parties like ATC through those entities, the entities' court-appointed receiver can recover the fraudulently transferred funds.

---

[11] *See also S.E.C. v. Shiv*, 379 F. Supp. 2d 609, 618 (S.D.N.Y. 2005) (By seeking the return of fraudulent transfers, a receiver acts to "undo" the fraud of the scheme's perpetrator.); *Armstrong v. Collins*, 2010 WL 1141158, *33 (S.D.N.Y. 2010); *Hecht v. Malvern Prep. Sch.*, 716 F. Supp. 2d 395, 402 (E.D. Pa. 2010); *S.E.C. v. Forte*, 2012 WL 1719145, *7 (E.D. Pa. 2012); *Quilling v. Grand St. Trust*, 2005 WL 1983879, at *6 (W.D.N.C. 2005); *S.E.C. v. Cook*, 2001 WL 256172, *2 (N.D. Tex. 2001); *Marwil v. Farah*, 2003 WL 23095657, at *7 (S.D. Ind. 2003); *Scholes v. African Enter., Inc.*, 838 F. Supp. 349, 356 (N.D. Ill. 1993); *Wing v. Hammons*, 2009 WL 1362389, *2-3 (D. Utah 2009).

**B.   The District Court Ignored This Court's Binding Precedent From *Lee*, *Dancing $*, and *Isaiah*.**

The Court should reverse the Order because the District Court ignored binding precedent from *Lee*, *Dancing $*, and *Isaiah.* Before this Court decided *Lee* (and then *Dancing $* and *Isaiah*), trial courts often "combine[d] a consideration of standing with determining the applicability of an *in pari delicto* defense." *Moecker v. Bank of Am., N.A.*, 2013 WL 12159056, at *3 (M.D. Fla. Oct. 21, 2013). This "perplexed courts," caused "confusion," and "yielded inconsistent results." *Id.* Much of this Circuit's jurisprudence regarding the application of the *in pari delicto* doctrine to receivers stems from an opinion by Florida's Second District Court of Appeal in *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543 (Fla. 2d DCA 2003), which expressly noted the confusing legal landscape that existed when it issued its order. *See id.* at 550 ("Unfortunately, the case law on this subject is not entirely clear, and no single case is dispositive."). The *Freeman* court's observation may have been true in 2003, but this Court decided *Lee* and *Dancing $* in 2014. Since then, a receiver's standing to recover fraudulent transfers under FUFTA has been clear and well-established. *See supra* § I.A.

Importantly, the District Court did not distinguish *Lee* or otherwise grapple with its application to the circumstances of this case. In fact, the Order never mentions *Lee* or *Dancing $* or even the phrase "fraudulent transfer." The District Court considered and quoted *Isaiah* with respect to imputation and the application

of the unasserted *in pari delicto* affirmative defense, but the Order omitted *Isaiah's*

discussion of *Lee* and the inapplicability of that defense to FUFTA claims:

> [W]hile a receiver receives his claims from the entities in receivership, he does not always inherit the sins of his predecessor. There are certain circumstances in which defenses such as unclean hands or *in pari delicto* would not apply to claims brought by a receiver, even if they would have applied against the entity in receivership. The court differentiated between two types of cases. On the one hand, there are actions that the corporation, which has been 'cleansed' through receivership, may bring directly against the principals or the recipients of fraudulent transfers of corporate funds to recover assets rightfully belonging to the corporation and taken prior to the receivership. We addressed these types of actions in *Wiand v. Lee.* There, we explained that even where a corporation is operated by a Ponzi schemer, it is still in the eyes of the law a separate legal entity with rights and duties. *Wiand*, 753 F.3d at 1202 (quoting *Scholes v. Lehmann,* 56 F.3d 750, 754 (7th Cir. 1995)). The money it receives from investors should be used for the corporation's stated purpose, and so when assets are transferred for an unauthorized purpose to the detriment of the defrauded investors, who are tort creditors of the corporation, the corporation itself is harmed. *Id.* Although the corporation may have participated in the fraudulent transfers prior to receivership, once the individual tortfeasor is removed and a receiver is appointed, the corporation becomes entitled to the return of its assets that had been diverted for unauthorized purposes, e.g., to perpetrate a Ponzi scheme. *Id* For that reason, we held that the receiver for the corporation has standing to sue the recipients of fraudulent transfers under the FUFTA. *Id.* at 1203.

*Isaiah*, 960 F.3d at 1306 (emphasis added).

*Isaiah* (like *Freeman*) distinguishes fraudulent transfer claims from

"common law tort claims against third parties to recover damages for the fraud

perpetrated by the corporation's own insiders." *Id.* Common law tort claims require

"at least one honest member of the board of directors or an innocent stockholder"

to circumvent the application of the *in pari delicto* affirmative defense, but a FUFTA claim is not a tort claim, as a matter of law. *See, e.g., Freeman v. First Union Nat. Bank*, 865 So. 2d 1272, 1277 (Fla. 2004) ("We simply can see no language in FUFTA that suggests an intent to create an independent tort for damages."); *In re Burton Wiand Receivership Cases*, 2008 WL 818504, at *9 (M.D. Fla. Mar. 26, 2008) ("FUFTA … is not … an independent cause of action in tort."). Given the equitable principles that govern this and similar receiverships, courts recognize that fraudulent transfer law "favor[s] exceptional treatment of receivers." *See, e.g., Knauer v. Jonathon Roberts Fin. Grp., Inc.*, 348 F.3d 230, 236 (7th Cir. 2003) (distinguishing between fraudulent transfers and tort claims with respect to imputation and the application of the *in pari delicto* defense).

Importantly, this Court affirmed the dismissal of the receiver's fraudulent transfer claims in *Isaiah* <u>but not due to a purported lack of standing</u>. The transactions at issue in that case involved routine banking activity, and this Court determined that such activity does not constitute a "transfer" under FUFTA. *Isaiah*, 960 F.3d at 1302 ("We disagree that a routine bank deposit constitutes a transfer to the bank within the meaning of the FUFTA."). As such, the District Court here appears to have overlooked both the legal and factual distinctions between the tort claims and the FUFTA claims in *Isaiah*, which explains why the Order differs so sharply from *Lee* and other receivership cases throughout the nation. Similarly,

*Freeman* did not even involve fraudulent transfer claims. *Freeman*, 865 So. 2d at 547 ("It is also worth emphasizing that [the receiver] does not maintain that these defendants … were the direct beneficiaries of fraudulent transfers."). This Court should reverse the Order because the District Court ignored *Lee*, *Dancing $*, and relevant parts of *Isaiah*. *See Lee*, 753 F.3d at 1205 (holding judge's "rationale to be an abuse of discretion because it fail[ed] to identify and apply" governing Eleventh Circuit precedent).

## C.    The Prior Precedent Rule Requires Reversal Of The Order.

"The law of this circuit is 'emphatic' that only the Supreme Court or this court sitting en banc can judicially overrule a prior panel decision." *Cargill v. Turpin*, 120 F.3d 1366, 1386 (11th Cir. 1997) (quoting *United States v. Woodard,* 938 F.2d 1255, 1258 (11th Cir.1991), *cert. denied,* 502 U.S. 1109, 112 S.Ct. 1210, 117 L.Ed.2d 449 (1992)). "Under the prior precedent rule, a panel cannot overrule a prior one's holding even though convinced it is wrong." *United States v. Steele*, 147 F.3d 1316, 1317-18 (11th Cir. 1998). To the extent the District Court's failure to consider *Lee* can be attributed to a belief that *Isaiah* overruled *Lee* or otherwise superseded the earlier case's holding, that belief cannot survive the prior precedent rule. In any event, *Isaiah* reaffirmed and did not attempt to overrule *Lee*, as excerpted and discussed in the preceding subsection.

Perhaps more importantly, this Panel will violate the prior precedent rule if it affirms the Order. The District Court dismissed the Receiver's fraudulent transfer claims with prejudice and without explanation. The Order appears to conflate the standing analysis under *Lee* with the *in pari delicto* affirmative defense, which only applies to tort claims. Affirming the Order would undo *Lee* and return receivership standing issues to the state of confusion that existed when Florida's Second District Court of Appeal decided *Freeman* 20 years ago.

## II. THE *IN PARI DELICTO* AFFIRMATIVE DEFENSE DOES NOT BAR THE RECEIVER'S CLAIMS AGAINST ANY DEFENDANT THROUGH IMPUTATION OF MISCONDUCT.

Although the District Court did not expressly invoke the *in pari delicto* affirmative defense in the Order, both the Order and the arguments raised by the defendant-appellees in their motions to dismiss rely on cases that discuss the defense. "The doctrine known by the latin phrase *in pari delicto* literally means 'of equal fault.'" *Knauer*, 348 F.3d at 236. According to one Florida court,

> [t]he phrase appears in the legal maxim: Where both parties are equally in the wrong, the position of the defendant is the stronger. *In pari delicto* refers to the plaintiff's participation in the same wrongdoing as the defendant. The defense of *in pari delicto* is both an affirmative defense and an equitable defense. Broadly speaking, the defense prohibits plaintiffs from recovering damages resulting from their own wrongdoing.
>
> The defense of *in pari delicto* is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality. In its classic

formulation, the *in pari delicto* defense was narrowly limited to situations where the plaintiff truly bore at least substantially equal responsibility for his injury, because in cases where both parties are *in delicto*, concurring in an illegal act, it does not always follow that they stand *in pari delicto*; for there may be, and often are, very different degrees in their guilt.

*O'Halloran v. PricewaterhouseCoopers LLP,* 969 So. 2d 1039, 1044 (Fla. 2d DCA 2007). "In determining the application of *in pari delicto* to a given case, a court first determines whether plaintiff's guilt is far less in degree than defendant's, so as to make the doctrine inapplicable." *In re Wiand*, 2007 WL 963165, at *7 (M.D. Fla. Mar. 27, 2007). "If plaintiff's guilt is not far less, the court inquires if applying the doctrine would be contrary to public policy." *Id.* (overruling magistrate judge and declining to adjudicate defense at motion to dismiss stage). "Because this equitable doctrine is an affirmative defense requiring proof of facts asserted by the defendant, it is usually not an appropriate ground for a Rule 12(b)(6) dismissal." *Sallah v. Fahrenheit Venture Fund LLC*, 2014 WL 12629450, at *7 (S.D. Fla. Sept. 5, 2014) (quotation omitted); *see also Perlman v. Bank of Am., N.A.*, 2014 WL 12279513, at *4 (S.D. Fla. Sept. 19, 2014) ("Mixed questions of law and fact remain unanswered, including inquiries into the presence of an honest decision maker within the Receivership Entities…."). Importantly, "an analysis of standing does not include an analysis of equitable defenses, such as *in pari delicto*." *Off. Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1149-50 (11th Cir. 2006).

### A. The District Court Cannot (As It Did) Assert *Sua Sponte* An Affirmative Defense On Behalf Of A Defendant.

"Courts generally lack the ability to raise an affirmative defense *sua sponte* with minor exceptions" not relevant to this appeal. *Roberts v. Gordy*, 877 F.3d 1024, 1028 (11th Cir. 2017) ("Here, the district court—and not the defense—raised the issue of registration validity [in a copyright case], and thus it erred in the manner of its review."). Even the involvement of "a constitutional right" does not "mitigate a defendant's burden of pleading its own affirmative defenses." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1240 (11th Cir. 2010).

The defendants collectively filed 6 motions to dismiss, totaling 150 pages, and none of those motions contain the phrase "*in pari delicto.*" Importantly and perhaps dispositively, the Receiver only asserted fraudulent transfer claims against ATC, but ATC never argued that the Receiver lacked standing to assert those claims. ATC never even argued that the *in pari delicto* affirmative defense bars the Receiver's tort claims against the company. Instead, ATC's arguments focused entirely on the purported lack of personal jurisdiction. Manoukian and Spotex cited and briefly discussed *Isaiah* with respect to standing, but neither expressly invoked the *in pari delicto* affirmative defense, and they could not have done so with respect to fraudulent transfers because the Receiver did not assert FUFTA claims against those defendants. As explained below, the District Court's application of

the affirmative defense was substantively wrong, but it was also procedurally improper because the defendants never asserted the defense.

### B. The Complaint Alleges The Existence Of Innocent Stockholders, Which Defeats The *In Pari Delicto* Defense.

As mentioned above, much of this Circuit's jurisprudence regarding the application of the *in pari delicto* affirmative defense to receivers stems from *Freeman*. Importantly, <u>that case did not involve fraudulent transfers</u>. *See* 865 So. 2d at 547 ("It is also worth emphasizing that Mr. Freeman [the receiver] does not maintain that these defendants received unearned moneys from NorthAmerican [the receivership entity] or that they were the direct beneficiaries of fraudulent transfers.").[12] The receiver did not allege "any statutory cause of action" but rather "common law theories to recover damages on behalf of the corporation." *Id.*

Many of the factual allegations supporting those common law theories, however, hinged on certain defendants' provision of "normal, lawful banking operations" to the receivership entity. *Id.* at 552. According to the court, "merely

---

[12] The *Freeman* court expressly discussed *Scholes* and the difference between fraudulent transfer and tort claims. *Id.* at 550 ("[T]here are cases that emphasize that the corporation is not human and that the sins of its principals do not transfer to the corporation. Perhaps the most eloquent statement of this position is Judge Posner's description in *Scholes*. He states that the corporation in such a Ponzi scheme is a mere "robotic tool" or "evil zombie" of the principal. Once the receiver takes over, the corporation is freed from its spell and returned to good citizenship. It can then sue to recover its losses." (Citation omitted)); *see also id.* (citing *Scholes* and stating, "the receiver may also pursue certain claims that would be barred by the defense of *in pari delicto* if pursued by the corporation that was placed in receivership.").

conducting normal, lawful banking operations for the corporation is not enough to establish aiding and abetting an intentional tort against the corporation; the receiver needed to establish that these defendants had a duty owed to NorthAmerican to disclose the misconduct of the Grazianos [the perpetrators of the underlying scheme] to NorthAmerican as a separate corporate entity." *Id.*

> Once the lawful banking activities are removed from the complaint, all of these theories depend on some duty by the defendants to blow the whistle on the Grazianos by disclosing these matters to NorthAmerican. The receiver may have freed NorthAmerican from the spell of the Grazianos when he was appointed, but the historical fact remains that NorthAmerican was the robot or zombie of the Grazianos at all times relevant to the allegations in the amended complaint. As a result, a theory based on a duty to disclose misconduct to that corporation during a time prior to the receivership simply cannot stand <u>because no honest person existed within the corporation to whom such conduct could be reported</u>.

*Id.* at 552 (emphasis added). Subsequent cases from other courts seized on this language and developed an exception to the *in pari delicto* affirmative defense in receivership actions when there is an "honest person" within the corporation.

"This limitation on the general rule that the acts of a corporate agent are imputed to the corporation is commonly known as the 'adverse interest exception.'" *O'Halloran*, 969 So. 2d at 1045 (collecting cases). The *in pari delicto* affirmative defense can sometimes present a problem for receivers alleging tort claims, but "the presence of <u>any innocent decision-maker</u> in the management of a corporation can provide the basis for invoking the adverse interest exception,

preventing the imputation of wrongdoing and defeating the use of the *in pari delicto* defense against the corporation." *Id.* (emphasis added)*; see also In re Wiand*, 2007 WL 963165 at *7 ("Florida courts have accordingly held that *in pari delicto* bars receivers from pursuing independent tort claims for damages, in cases where there is not at least one honest member of the board of directors or an innocent stockholder." (Quotation omitted)); *In re Mirabilis Ventures, Inc.*, 2011 WL 397788, at *3 (M.D. Fla. Feb. 1, 2011) (quoting *O'Halloran*); *Fahrenheit Venture Fund*, 2014 WL 12629450 at *7 (quoting *Wiand* and *Freeman*).

This Court's decision in *Isaiah* did not change the pertinent analysis. *Isaiah* explicitly acknowledged that, under Florida law, a receiver may plead standing by alleging that "the corporation in receivership has at least one honest member of the board of directors or an innocent stockholder." *Isaiah*, 960 F.3d at 1306 (citing *Freeman*, 865 So.2d at 551). The *Isaiah* court never modified *Freeman. Id.* ("This case is indistinguishable from Freeman"). *Id.*; *see also Perlman v. PNC Bank, N.A.*, 38 F.4th 899, 904 (11th Cir. 2022) (discussing *Isaiah* and concluding, "if there is no innocent director or stockholder in those Receivership Entities, then the wrongful acts of [the perpetrator] cannot be separated from the Receivership Entities and the Receivership Entities cannot be said to have suffered an injury").

As a result, the Complaint should survive dismissal under *Freeman*, *O'Halloran*, and *Isaiah* because the Receiver alleged the existence of innocent stockholders:

> Over time, the CFTC Defendants raised funds from innocent investors through several forms of securities. For example, when OIG was formed, a portion of its common shares (less than 10% in total) was owned by at least six (6) innocent and honest shareholders, meaning they were not aware of the CFTC Defendants' misconduct. As such, any misconduct on the part of the individual CFTC Defendants should not be imputed to OIG and the other Oasis Entities.

Compl. ¶ 53. "There were more than sixty (60) preferred shareholders from 2013-2017…." *Id.* ¶ 56. "Nearly all of the preferred stock shareholders were innocent and honest, meaning they were unaware of the CFTC Defendants' misconduct." *Id.* "As such, any misconduct on the part of the individual CFTC Defendants should not be imputed to OIG and the other Oasis Entities." *Id.*; *see also id*. at fn. 4 (regarding Oasis Management).

In determining that the Receiver lacks standing to assert tort claims, the District Court made three fundamental errors. First, the District Court claimed that "[t]he Eleventh Circuit decision in *Isaiah* does not hold that a receiver's recitation that 'one honest member of the board of directors or an innocent stockholder' exists, is sufficient to allege standing." Order at 27. The District Court is wrong. *Compare Isaiah*, 960 F.3d at 1306 ("*Freeman* held that unless the corporation in receivership has at least one honest member of the board of directors or an

31

innocent stockholder, the fraud and intentional torts of the insiders cannot be separated from those of the corporation itself and the corporation cannot be said to be an entity separate and distinct from the individual tortfeasors.") *with id.* at 1307 ("This case is indistinguishable from *Freeman*."). In fact, the District Court quoted *Freeman's* "innocent stockholder" language, **with bold emphasis added**, only sentences before contradicting itself and declaring innocent stockholders irrelevant. The Order is internally inconsistent and wrong.

Second, the District Court claims, "[t]o properly establish standing under *Freeman*, a receiver must allege sufficient facts that plausibly suggest a receivership entity is separate and distinct from these intentional tortfeasors." Order at 27 (quotation omitted). In *Isaiah*, this Court stated that the existence of an innocent stockholder is sufficient to allege that the corporation is "separate and distinct from the intentional tortfeasors." *Isaiah*, 960 F.3d at 1306 (citing *Freeman*, 865 So.2d at 551). The District Court acknowledged that the Receiver alleged the existence of an innocent stockholder. Order at 27; *see also* Compl. ¶¶ 50, 53-59. The Order nevertheless concludes, "[m]erely alleging that a corporation has shareholders, limited partners, or investors is insufficient to establish standing under either *Isaiah* or *Freeman*." Order at 27. The District Court's statement expressly contradicts *Isaiah* and *Freeman*.

Third, the District Court identified the "determinative factor" regarding standing as "whether Plaintiff's Amended Complaint contains facts that make it plausible that CFTC Action Defendants Anile, DaCorta, and Montie operated the OASIS Entities as separate and distinct entities." Order at 27-28. The pertinent inquiry for tort claims, however, does not concern the relationships <u>among</u> the Receivership Entities but rather <u>between the Relationship Entities and their owners, operators, and employees</u>. Courts attempt to determine whether an honest person (including a stockholder) existed within a company to which a third party could have "blown the whistle" regarding alleged wrongdoing. As such, the allegations that the Receivership Entities shared the same offices and employees, commingled funds, and operated as a common enterprise under the Oasis trade name (*see* Order at 28) are not relevant to the pertinent inquiry because they concern the relationship <u>among</u> the entities – not <u>between</u> the entities and their owners, operators, and employees. *See id*. at 28. Because the District Court misidentified the requisite distinction and ignored the plain language of *Freeman* and *Isaiah*, this Court should reverse the Order and remand this action.

### C. If Remanded, The Receiver Will Amend The Complaint To Include A Wide Variety Of "Honest Persons."

The Complaint alleges the existence of innocent "stockholders," and as explained above, those allegations are sufficient to survive the imputation analysis and the application of the *in pari delicto* affirmative defense, especially at the

motion to dismiss stage. The language in *Freeman* and *O'Halloran*, however, is significantly broader. For example, the *Freeman* court initially mentioned "one honest member of the board of directors or an innocent stockholder" but later expanded the pertinent group to any "honest person … within the corporation to whom [misconduct] could be reported." 865 So. 2d at 551, 552 (emphasis added). The *O'Halloran* court held that 'the presence of <u>any innocent decision-maker</u> in the management of a corporation can provide the basis for invoking the adverse interest exception, preventing the imputation of wrongdoing and defeating the use of the *in pari delicto* defense against the corporation." 969 So. 2d at 1045 (emphasis added). In *Isaiah*, this Court added the phrase "at least one innocent officer or director" to the analysis. 960 F.3d at 1308. In other words, the universe of people who can prevent imputation and the application of the *in pari delicto* affirmative defense by simply existing is broad. Any attempt to draw fine lines between various corporate titles and structures would expand the defense beyond its purpose. *Cf. Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011) (rejecting "form over substance rule in fraudulent transfer actions involving Ponzi schemes" that "ignore[s] the realities of how Ponzi schemes operate"). As stated in *Freeman* and *O'Halloran*, the relevant inquiry should seek to identify any "honest person" or "innocent decision-maker."

On remand and if necessary, the Receiver will expressly identify numerous such honest or innocent people. First, as alleged in paragraph 53 of the Complaint, OIG had at least 6 honest and innocent shareholders when it was formed. Although they eventually became lenders instead of shareholders, many of those people were still invested in the scheme when the Receiver was appointed.[13]

Second, as alleged in paragraph 56 of the Complaint, OIG had "more than sixty (60) preferred shareholders from 2013- 2017." Although they eventually became lenders instead of shareholders, many of those people were still invested in the scheme when the Receiver was appointed.

Third, while the Receiver indisputably controls OIG pursuant to the Consolidated Order, the company's current Register of Members lists Oasis Management, the Receiver, and 7 additional shareholders – Matt Cozzolino, Butch Lyle, Rocco Garbellano, Brian McMahon, Joe Martini, Joe Martini Jr., and Joe LaVecchia. On remand, the Receiver will expressly identify these shareholders and

---

[13] Although not mentioned in the Order, certain defendants argued that these individuals could not constitute the requisite innocent stockholders or other honest persons because their initial equity interests in OIG were converted to debt-based instruments – *i.e.*, notes. Adoption of that argument would require receivers to identify not only innocent and honest people but also the precise nature of their interest in a receivership entity – equity versus debt, employee or officer versus director, manager versus member, general partner versus limited partner, *etc*. This Court has previously refused to draw such distinctions in Ponzi scheme cases. *See Perkins*, 661 F.3d at 627.

plead both their connection to OIG and the impact of their existence on the *in pari delicto* affirmative defense.

Fourth, the complaint alleges that CFTC Defendant Raymond Montie formed, owned, and controlled OIG along with CFTC Defendants Joseph Anile and Michael DaCorta. Compl ¶ 14. He also served on its Board of Directors. *Id*. Montie has always maintained his innocence and claims that he was not aware of the fraud perpetrated by Anile and DaCorta. Montie has not been criminally charged in connection with the scheme. The Receiver believes Montie has civil liability to the CFTC under the commodities laws and to the Receiver under various tort theories, primarily the breach of the fiduciary duty of care, but his existence raises, at minimum, a factual question regarding imputation and the applicability of the *in pari delicto* affirmative defense at the pleading stage. On remand, the Receiver will expand his factual allegations about Montie and the Receivership Entities.

Fifth and similarly, the Complaint alleges that CFTC Defendant John Haas was Satellite Holdings' director. Compl ¶ 14. Haas has always maintained his innocence and claims that he was not aware of the fraud perpetrated by Anile and DaCorta. Haas has not been criminally charged in connection with the scheme. Like Montie, the Receiver believes Haas has civil liability to the CFTC and to the Receiver, but his existence raises, at minimum, a factual question regarding

imputation and the applicability of the *in pari delicto* affirmative defense at the pleading stage. On remand, the Receiver will expand his factual allegations about Haas and the Receivership Entities.

Sixth, the Receivership Entities had several officers and a material number of employees. Almost all these officers and employees were "honest persons" within the Receivership Entities. Certain of those employees both worked for Receivership entities <u>and</u> invested money in the scheme. They filed claims in the Receiver's claims process, alleging large losses. People typically do not seek to defraud themselves. On remand, the Receiver will allege these individuals' roles.

Seventh, more than 700 people invested in Receivership Entities, primarily through the execution of promissory notes in the latter years of Anile's and DaCorta's scheme. ATC, Manoukian, and Spotex knew these people existed because they assisted DaCorta with the creation and maintenance of their fraudulent accounts. *See* Compl. ¶¶ 78-92. They knew almost all the investors were citizens of the United States, which made their solicitation impermissible. *Id*. They also knew that DaCorta lost millions of dollars and was not a profitable trader. *Id.* ¶¶ 92, 101, 104. ATC, Manoukian, or Spotex could have blown the whistle about DaCorta to any of these investors. The *in pari delicto* affirmative defense is not meant to allow parties to ignore fraud while reaping millions of dollars in profit at the expense of the defrauded, including the Receivership Entities and their

creditors. "If the [C]ourt were to apply the doctrine of *in pari delicto* in this case, the result would be the protection the alleged wrongdoers and the punishment of the innocent victims." *Hays v. Paul, Hastings, Janofsky & Walker LLP*, 2006 WL 4448809, at *10 (N.D. Ga. Sept. 14, 2006).

> ### D. Given Disputed Facts Regarding Innocent Stakeholders, The District Court's Application of The *In Pari Delicto* Affirmative Defense Was Premature.

"An *in pari delicto* defense may be successfully asserted at the pleading stage only where the facts establishing the defense are: (1) definitively ascertainable from the complaint and other allowable sources of information, and (2) [sufficient] to establish the affirmative defense with certitude." *Pearlman v. Alexis*, 2009 WL 3161830, at *3 (S.D. Fla. Sept. 25, 2009) (quotation omitted). "Multiple courts in this District have rejected the *in pari delicto* defense as premature at the motion-to-dismiss stage." *Vyas v. Polsinelli PC*, 2022 WL 1568405, at *3 (M.D. Fla. May 18, 2022) (collecting cases and denying motion to dismiss as premature). "The more typical practice in this Circuit is to consider affirmative defenses on summary judgment." *Id.*; *see also Alexis*, 2009 WL 3161830 at *3 (quotation omitted) (denying motion to dismiss tort claim as "premature" because the "[r]eceiver and the defendants … dispute specific doctrinally relevant facts, such as whether there were other, innocent managers of the [r]eceivership [e]ntities that could prevent [perpetrator's] alleged conduct from

being imputed to the [r]eceivership [e]ntities for purposes of the *in pari delicto* bar); *Moecker*, 2013 WL 12159056 at *6 (refusing to evaluate in pari delicto affirmative defense "at the motion to dismiss stage.")

### III. SPOTEX IS NOT ENTITLED TO STATUTORY IMMUNITY UNDER THE COMMUNITY DECENCY ACT

The Communication Decency Act grants immunity to providers and users of an interactive computer service. 47 U.S.C. § 230(c). Section 230(c) of the CDA states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Courts have held that Section 230 immunity requires proof that: "(1) defendant be a service provider or user of an interactive computer service; (2) the cause of action treats a defendant as a publisher or speaker of information; and (3) a different information content provider provided the information." *Whitney Info. Network, Inc. v. Verio, Inc.,* 2006 WL 66724, at *2 (M.D. Fla. Jan. 11, 2006); *see also F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1196 (10th Cir. 2009); *F.T.C. v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016); *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1091 (9th Cir. 2021). If a defendant "fails to satisfy any one of the three, it is not entitled to immunity." *Accusearch Inc.*, 570 F.3d at 1196. As explained below, Spotex cannot satisfy any of the three requisite elements, and as a result, the Court should reverse the Order and remand this action. *See National Coalition on Black Civic*

*Participation v. Wohl*, 2021 WL 4254802, at *6 (S.D.N.Y. Sept. 17, 2021) (dismissal unwarranted if any element is lacking on the face of the complaint).

### A. Spotex Is Not An Interactive Computer Service Or Access Service Provider.

The CDA defines interactive computer service as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(c). Courts have included internet service providers, website exchange systems, online message boards, and search engines within this definition. *LeadClick Media*, 838 F.3d at 175; *see Dyroff v. Ultimate Software Group, Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019) ("The prototypical service qualifying for [CDA] immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others") (citation omitted). There are no cases where a court has included back-office financial software within this definition, especially where the provider was responsible for the execution of the transactions recorded in the financial software. Both the District Court and Spotex cited "no case law applying the definition of 'interactive service provider' in a similar context…." *LeadClick Media*, 838 F.3d at 175.

For example, the District Court recognized that the CDA traditionally "immunized social networking sites and online matching services" and stated that is now "immunizes a wide range of online platforms including: search engines, email services, and many other platforms from civil liability." Order at 18. The Order cites numerous cases in support of those uncontroversial positions, but Spotex is not Omegle, Twitter, Grindr, Google, Zoom, or Microsoft – *i.e.*, the companies from the cases cited in the Order. Because nothing in the Complaint could plausibly be understood to equate the services provided by Spotex with the services provided by those companies, the cited cases are inapposite.[14]

Indeed, the District Court's conclusion that Spotex qualifies as an ICS is based on 47 U.S.C. § 230(f)(4), which defines the term "access service provider" as "a provider of software (including client or server software), or enabling tools that do any one or more of the following: (A) filter, screen, allow, or disallow content; (B) pick, choose, analyze, or digest content; or (C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content."

---

[14] <u>Congress did not intend the CDA to immunize the financial markets and their participants</u>. During DaCorta's criminal trial, Christopher Mitchell of Spotex, testified that the company is an "exchange" or "auction house": (1) "[O]ur platform actually has people providing prices or organizations providing prices on the platform and then other people or organizations looking to trade on those prices. So we are an exchange." (2) "[W]e are the auction facility." If necessary to amend and permitted to do so, the Receiver will include this testimony.

*Id.* According to the District Court, Spotex's white label software suite clearly constitutes "software . . . or enabling tools" because, as its description provides, it is a software that allowed ATC to "choose, analyze, or digest" account information and later transmit or display that information in the form of account records." Order at 19. The District Court cited *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1175 (9th Cir. 2009), in support of its conclusion but ignored the context of that case and half of the pertinent holding.

As the *Zango* court observed, Section 230 "provides protection for private blocking and screening of offensive material." *Id.* at 1173. "[T]he statute plainly immunizes from suit a provider of interactive computer services that makes available software that filters or screens material that the user *or the provider* deems objectionable." *Id.* (emphasis added). This makes sense because "[t]he CDA was enacted to control the exposure of minors to indecent material on the Internet." *Id.* (quotation omitted). "The material that can be blocked under the exemption includes 'material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected[.]'" *Id.* (quoting § 230(c)(2)(A)).

> Thus, a provider of software or enabling tools that filter, screen, allow, or disallow content <u>that the provider or user considers obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable</u> may not be held liable for any action taken to make

available the technical means to restrict access to that material, so long as the provider enables access by multiple users to a computer server.

*Id.* (emphasis added). "According protection to providers of programs that filter adware and malware is also consistent with the Congressional goals for immunity articulated in § 230 itself," including (1) "to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services," and (2) "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." *Id.* (quotations omitted).

The District Court's conclusion that Spotex is an interactive computer service because it is an access service provider strips 47 U.S.C. § 230(f)(4) of context and legislative history. *Zango* is about software that allows users to filter adware and malware, which is consistent with the reasons Congress passed the CDA.[15] *Id.* at 1175 ("Kaspersky is an 'access software provider' because, by providing anti-malware software, it 'provide[s] software ... or enabling tools that ... filter, screen, allow, or disallow content.'" (quoting § 230(f)(4)). Facilitating the

---

[15] "Malware may … expose users to objectionable content, including links to pornographic websites, or to software that can compromise the user's privacy, computer security, or identity." *Id.* at 1174.

fraudulent trading of foreign currency has nothing to with the CDA. Indeed, almost every form of software ever created "filters" data in some form. Adopting the District Court's reasoning would extend CDA immunity to almost all software providers at a time (as of this filing) when important parts of the CDA are being scrutinized by the Supreme Court. The Court should reverse the Order for this reason alone.

### B.    Spotex Is Not A Publisher Or Speaker Of Information.

In the context of Section 230, "'publication' generally 'involve[s] reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Lemmon*, 995 F.3d at 1091; *see Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009) (noting that Webster's Third New International Dictionary defines "'publisher,' in relevant part, as 'the reproducer of a work intended for public consumption' and also as 'one whose business is publication'") (citation omitted). Nothing in the Complaint can plausibly be understood to fall within this definition or any other definition of the term. For example, the delivery of account records for financial transactions, which are not intended for public consumption, does not fall within this definition. Moreover, there should never be an "editorial decision" regarding the delivery of accurate and truthful account information to a customer concerning an investment because the information provider owes a duty of care not to supply false information to customers. *See, e.g.,*

Restatement of Torts (2d) § 552(1) (explaining duty of care for professionals not to supply false information in the guidance of others in business transactions).

Spotex ignored this prong of the test in its motion to dismiss. In the absence of any argument from Spotex (*cf. supra* § II.A.), the District Court asserted that the Receiver faults Spotex for designing a flawed system that generated false account records. Order at 20. According to the District Court, the Receiver's claims "are inextricably **related** to Spotex's role in providing software that collects, generates, and transmits content…." *Id.* (emphasis added). The "claims aim to hold Spotex responsible for the reports generated using its software, which as a result, would punish Spotex **as if Spotex** were the publisher or speaker of the information contained within those reports." *Id.* (emphasis added). The District Court concludes that Spotex engaged in "protected activity under the CDA (*id.*), but that statue protects publishers and speakers – not entities "related" to publishers and speakers "as if" the entities are publishers and speakers. Congress did not intend the CDA to apply to commodities exchanges or auction houses like Spotex, and the loose language in the Order concedes as much.

The Order also cites several cases that involve alleged software design defects, but those cases all involve "editing or removing offensive content" in social media – not fraudulent financial transactions. *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 588 (S.D.N.Y. 2018), *aff'd,* 765 F. App'x 586 (2d Cir. 2019) ("To

the extent Herrick has identified a defect in Grindr's design or manufacture or a failure to warn, it is inextricably related to Grindr's role in editing or removing offensive content—precisely the role for which Section 230 provides immunity."); *Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019) (holding that Facebook is a publisher even though it uses algorithms). Again, extending protections enjoyed by social media companies with millions of users to financial services companies like Spotex that work hand-in-hand to create customized products for each user on a case-by-case basis would expand the concept of a publisher under the CDA beyond all recognition and encompass any software with a reporting function.

### C. Spotex Was The Information Content Provider; It Automated False Account Records.

The District Court relied on the Ninth Circuit's decision in *Gonzalez v. Google* to conclude that Spotex is not a content provider.[16] Under *Gonzalez* and its predecessors, "a website that creates or develop content by making a material contribution to its creation or development loses § 230 immunity." *Id*. at 892 (quotation omitted). "Other circuits have adopted this 'material contribution' test, acknowledging that making a material contribution does not mean merely taking action that is necessary to the display of the allegedly illegal content, but rather,

---

[16] That case is pending before the Supreme Court, as of this filing. *Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021), *cert. granted*, 214 L. Ed. 2d 12, 143 S. Ct. 80 (2022), and *cert. granted sub nom. Twitter, Inc. v. Taamneh*, 214 L. Ed. 2d 12, 143 S. Ct. 81 (2022).

being responsible for what makes the displayed content allegedly unlawful." *Id.* (quotations omitted).

The Complaint here alleges that "Spotex actively assisted, participated, supervised, and ensured automating or programming the necessary 'adjustments' on the back-end of the investor online portal to allow the CFTC Defendants to carry out the ruse of false investor account records." Compl. ¶ 120. "It was necessary to automate the adjustments from manual inputs, as the number of investors grew and the CFTC Defendants raised more money from investors and transferred more money to ATC." *Id.* ¶ 121. Spotex worked directly with Oasis employees to implement and automate the fraudulent adjustments. *See id.* ¶ 122 (email requesting implementation of automation), ¶ 123 ("The goal is to be able to do the adjustment into the client account automatically via FIX or via an upload," ¶ 124 ("There is a report available in our web service called Margin Upload Request. Using this method, the adjustments can be uploaded for required accounts into our back-office. This Report is available only with master login."). In fact, "each of the Defendants confirmed that they knew the adjustments were invisible from the API (Application Programming Interface), the software that permits the transfer of data from the back-end/back-office to the end-user/investor." *Id.* ¶ 125. "In other words, Defendants confirmed that they knew that investors could not see the adjustments through the website investors used to view their accounts." *Id.*

These are factual allegations of Spotex's material contribution to fraud, supported by contemporaneous email communications. The adjustments do not merely display the fraud more efficiently; the adjustments are the fraud.

The District Court acknowledges that the Receiver alleged that Spotex created custom software for the Receivership Entities, which allowed the perpetrators of the scheme underlying this case to automatically falsify account records and commit fraud. Order at 23 (citing Doc. 50 at 21 & Compl. ¶¶ 122-26). The Court nevertheless concludes that "Spotex's automation of adjustments and creation of white label software are actions taken to display content" because the Receiver purportedly (1) "does not allege Spotex changed, altered, or otherwise manipulated information the CFTC Action Defendants reported," (2) does not "allege Spotex individually determined what adjustment(s) needed to be made and thereafter performed the adjustment(s) for the CFTC Action Defendants," and (3) "does not allege Spotex conditioned either the OASIS Entities' or the CFTC Action Defendants' use of the white label software on participation in unlawful activity." *Id.* The District Court's reasoning essentially rewards Spotex for working hand-in-hand with ATC, Manoukian, DaCorta and others to automate fraud.

With respect to the first alleged pleading failure, the adjustments and the "manipulated information" are one and the same. One cannot exist without the other. With respect to the second and third alleged failures, there is no requirement

that Spotex have acted "individually" or conditioned anything on participation in illegal activity. A "material contribution" to the wrongdoing of others is sufficient, and the Complaint contains detailed factual allegations to that end.

## IV. THE DISTRICT COURT ABUSED ITS DISCRETION BY DISMISSING THE COMPLAINT WITH PREJUDICE

As explained above, the District Court was wrong to dismiss the Complaint, but at minimum, it should have afforded the Receiver an opportunity to amend his allegations after reviewing the Order.

> A court abuses its judicial discretion if, among other things, the judge fails to apply the proper legal standard. Here, the proper legal standard is established by Fed. R. Civ. P. 15(a)(2): "The court should freely give leave [to amend] when justice so requires."

*Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 996 (11th Cir. 2014) (holding district court in receivership case abused its discretion) (citations omitted). "A grant of leave to amend is particularly appropriate following dismissal of a complaint for failure to state a claim, and, in the absence of a declared or apparent reason, an outright refusal to grant leave to amend is an abuse of discretion." *Thomas*, 705 F.2d at 1307-08; *see also Perlman v. Vairog US, LLC*, 2021 WL 9426826, at *4 (S.D. Fla. Mar. 9, 2021) (allowing receiver to amend to comply with *Lee* because "[c]ourts have held that standing exists if the Receivership Entities were used as instruments of [Ponzi operator's] fraud or were his "robotic tools").

If the Court does not reverse the Order, justice requires, at minimum, that the Receiver be afforded an opportunity to amend the Complaint for three independent reasons. First, the Receiver filed one amended complaint after a motion for an extension of time but before the Court issued its one and only Order. The Receiver has not been afforded an opportunity to address the issues raised in the Order through amendment or otherwise, many of which were first raised by the District Court and not by the defendant-appellees.

Second, if this Court determines that the Complaint does not sufficiently allege "innocent stockholders" or other honest people within the Receivership Entities, the Receiver will add detailed information regarding those stockholders and other individuals, as explained above in Section II.C. Given the ability to plead such facts, amendment would not be futile.

Third, "in a case involving a Ponzi scheme, the interests of the [r]eceiver are very broad and include not only protection of the receivership *res*, but also protection of defrauded investors and considerations of judicial economy." *S.E.C. v. Vescor Capital Corp.*, 599 F.3d 1189, 1197 (10th Cir. 2010). The Receiver's claims against the defendant-appellees represent the Receivership Estate's last remaining source of recovery. To date, the Receiver has only been able to satisfy approximately 17% of the approved amounts of creditors' claims. Justice requires that the Receiver be afforded at least one opportunity after reviewing the Order to

amend the Complaint. Otherwise, the Receivership Entities will only be able to distribute pennies on the dollar to their creditors.

**CONCLUSION**

Because the District Court ignored *Lee, Dancing $*, and relevant portions of *Isaiah*, the Order fails to address the "evil zombie" theory of standing, and improperly dismisses the Receiver's FUFTA claims against ATC. Pursuant to the prior panel rule, the Court must reverse and remand on that issue, at minimum. *See Lee*, 753 F.3d at 1205 (holding judge's "rationale to be an abuse of discretion because it fail[ed] to identify and apply" governing Eleventh Circuit precedent).

The District Court also misapplied *Freeman*, *Isaiah*, and, indirectly, the *in pari delicto* affirmative defense to the Receiver's common law tort claims. The Receiver expressly alleged the existence of innocent stockholders. On remand, if necessary after the Court's determination, the Receiver will expand these allegations significantly, although that should not be necessary under Federal Rule of Civil Procedure 8 for an affirmative defense at the motion to dismiss stage.

With respect to another affirmative defense, Spotex is not entitled to immunity under the CDA. Affirming the Order would contravene Congressional intent. Spotex facilitates forex trading; it has nothing to do with the reasons Congress passed the CDA and does not fit the statutory framework. Combined with the fact that the District Court never afforded the Receiver an opportunity to

amend the Complaint after the issuance of the one and only pertinent Order, this Court should reverse and remand.

## CERTIFICATE OF COMPLIANCE

**I CERTIFY** that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief contains 12,864 words, permissibly excluding the items identified in 11th Cir. R. 28-1 and 32-4. Times New Roman 14 is the type style and size used in this brief.

**s/Jared J. Perez**
Jared J. Perez, FBN 0085192
Jared.Perez@JaredPerezLaw.com
Jared J. Perez P.A.
301 Druid Road West
Clearwater, FL 33756
Tel.: (727) 641-6562

*Attorney for Appellant/Receiver,*
*Burton W. Wiand*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 3, 2023, I filed the foregoing through the Court's ECF system, which served all counsel of record. Pursuant to 11th Cir. R. 31-5, I also mailed four paper copies of the foregoing to the Clerk of the Court by commercial carrier to the address listed below:

Elbert P. Tuttle Courthouse

56 Forsyth Street, N.W.

Atlanta, GA 30303

**s/Jared J. Perez**
Jared J. Perez, FBN 0085192