IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO. 22-13658-CC

---

BURTON W. WIAND, as Receiver for Oasis International Group,
Limited, Oasis Management, LLC, and Satellite Holding Company,

*Plaintiff-Appellant,*

v.

ATC BROKERS LTD., DAVID MANOUKIAN,
and SPOTEX LLC,

*Defendants-Appellees.*

---

RESPONSE BRIEF OF DEFENDANTS-APPELLEES
ATC BROKERS, LTD. AND DAVID MANOUKIAN

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

---

Gregory W. Kehoe
Christopher Torres
Christopher R. White
Greenberg Traurig, P.A.
101 E. Kennedy Blvd., Suite 1900
Tampa, Florida 33602
Telephone: 813.318.5700
kehoeg@gtlaw.com
toreesch@gtlaw.com
whitech@gltaw.com

Jay A. Yagoda
Greenberg Traurig, P.A.
333 S.E. Second Ave., Suite 4400
Miami, Florida 33131
Telephone: 305.579.0500
yagodaj@gtlaw.com

*Counsel for Defendants-Appellees*
*ATC Brokers, Ltd. and David Manoukian*

***Burton Wiand v. ATC Brokers Ltd., et al.***,
**Case No. 22-13658-CC**

**CERTIFICATE OF INTERESTED PERSONS AND**
**CORPORATE DISCLOSURE STATEMENT**

Defendants-Appellees ATC Brokers, Ltd. and David Manoukian

provide the following certificate of interested persons:

1.  1331 Lost Key Place, LLC, *Entity in Receivership*

2.  444 Gulf of Mexico Drive, LLC, *Entity in Receivership*

3.  4064 Founders Club Drive, LLC, *Entity in Receivership*

4.  6922 Lacantera Circle, LLC, *Entity in Receivership*

5.  4OAKS LLC, *Entity in Receivership*

6.  Adams, Matthew S., *Counsel for Defendant-Appellee Spotex LLC*

7.  Anile, Joseph S., II, *Defendant in underlying Regulatory Action*

8.  ATC Brokers, Ltd., *Defendant-Appellee*

9.  Bowling Green Capital Management, LLC, *Entity in Receivership*

10. Commodity Futures Trade Commission, *Plaintiff in underlying Regulatory Action*

**CERTIFICATE OF INTERESTED PERSONS AND**
<u>**CORPORATE DISCLOSURE STATEMENT**</u>
**(Continued)**

11.   DaCorta, Michael J., *Defendant in underlying regulatory action*

12.   DeMaria, Joseph A., *Counsel for Defendant-Appellee Spotex LLC*

13.   Duran, Francisco ("Frank") L., *Defendant in underlying Regulatory Action*

14.   Eldgidely, Robert F., *Counsel for Defendant/Appellee Spotex LLC*

15.   Fox Rothschild, LLP, *Counsel for Defendant-Appellee Spotex LLC*

16.   Greenberg Traurig, P.A., *Counsel for Defendants-Appellees ATC Brokers Ltd. and David Manoukian*

17.   Haas, John J., *Defendant in underlying Regulatory Action*

18.   Katz, Joshua A., *Counsel for Plaintiff-Appellant Burton Wiand*

19.   Kehoe, Greg, Counsel for *Defendants-Appellees ATC Brokers*

**CERTIFICATE OF INTERESTED PERSONS AND**
**CORPORATE DISCLOSURE STATEMENT**
**(Continued)**

*Ltd. and David Manoukian*

20.   Kingman, Marissa Koblitz, *Defendant-Appellee Counsel for Spotex LLC*

21.   Lagoon Investments, Inc., *Entity in Receivership*

22.   Manoukian, David, *Defendant-Appellee and shareholder of ATC Brokers Ltd.*

23.   Manoukian, Jacques, *shareholder of ATC Brokers Ltd.*

24.   Montie, Raymond P., III, *Defendant in underlying Regulatory Action*

25.   Oasis Global FX, Limited, *Entity in Receivership*

26.   Oasis Global FX, S.A., *Entity in Receivership*

27.   Oasis Global (Nevis) Limited, *Entity in Receivership*

28.   Oasis International Group, Limited, *Entity in Receivership*

29.   Oasis Management, LLC, *Entity in Receivership*

30.   Rengstl, Patrick J., *Counsel for Plaintiff-Appellant Burton Wiand*

**Burton Wiand v. ATC Brokers Ltd., et al.,**
**Case No. 22-13658-CC**

**CERTIFICATE OF INTERESTED PERSONS AND**
**<u>CORPORATE DISCLOSURE STATEMENT</u>**
**(Continued)**

31.    Roar of the Lion Fitness, LLC, *Entity in Receivership*

32.    Sallah Astarita & Cox, LLC, *Counsel for Plaintiff-Appellant Burton Wiand*

33.    Sallah, James D., *Counsel for Plaintiff-Appellant Burton Wiand*

34.    Satellite Holdings Company, *Entity in Receivership*

35.    Scriven, Hon. Mary Stenson, *U.S. District Court Judge*

36.    Spotex LLC, *Defendant-Appellee*

37.    Torres, Christopher, *Counsel for Defendants-Appellees ATC Brokers Ltd. and David Manoukian*

38.    White, Christopher R., *Counsel for Defendants-Appellees ATC Brokers Ltd. and David Manoukian*

39.    Wiand, Burton W., *Plaintiff-Appellant*

40.    Yagoda, Jay A., *Counsel for Defendants-Appellees ATC Brokers Ltd. and David Manoukian*

## <u>CORPORATE DISCLOSURE</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Defendants-Appellees ATC Brokers Ltd. and David Manoukian make the following statement as to corporate ownership: ATC Brokers, Ltd. is not a publicly held corporation.

_____/s/ Jay A. Yagoda_____
Jay A. Yagoda

## STATEMENT REGARDING ORAL ARGUMENT

The main issue on appeal involves a straightforward application of this Court's well-settled precedent in *Isaiah v. JPMorgan Chase Bank, N.A.*, 960 F.3d 1296 (11th Cir. 2020), regarding the scope of a receiver's standing to pursue an action ancillary to a receivership. Efforts made by Burton Wiand (the Receiver) to request this Court abandon that precedent do not warrant the devotion of additional judicial resources. This case fits the *Isaiah* facts. The Receiver has alleged claims on behalf of sham corporations set up solely to perpetrate a fraudulent Ponzi scheme. *Isaiah* bars the Receiver's right to pursue the claims based on his allegations—without exception. Holding otherwise would reward the sham corporations, not the innocent investors that the sham corporations duped.

Other legal bars the district court did not need to address lead to the same result. ATC Brokers, Ltd. (ATC UK), a British company based and only doing business in the U.K., and one of its principals, David Manoukian, operated a brokerage firm at which the fraudsters used licensed foreign entities to open omnibus accounts to trade in foreign exchange markets. But neither ATC UK nor Manoukian made any

trading decisions or owed a duty of care, and ATC UK had no connections to the U.S., leaving the district court without personal jurisdiction over it.

Oral argument to flesh out new allegations the Receiver argues make a difference do not accomplish that goal. The Receiver did not timely move for leave to amend or ever propose additional allegations to cure the legal deficiencies required to preserve the error for appeal. And that is because he could not. As the district court properly found, a second version of the same deficient allegations was enough to dismiss this case once and for all. Accordingly, ATC UK and Manoukian respectfully submit that oral argument is unnecessary.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .................................................................. C-1

STATEMENT REGARDING ORAL ARGUMENT .................................... i

TABLE OF CITATIONS ............................................................. v

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF THE ISSUES ....................................................... 2

STATEMENT OF THE CASE AND FACTS ............................................. 3

I.   STATEMENT OF THE CASE. ................................................... 3

II.  STATEMENT OF FACTS. ....................................................... 6

    A.   The Oasis Entities' Fraudulent Plan. ................................... 6

        1.   The Ponzi scheme. ................................................ 6

        2.   The CFTC Defendants controlled the Oasis Entities as sham corporations. .................................... 8

        3.   ATC UK's and Manoukian's alleged third-party roles. ........................................................... 11

    B.   The CFTC Action. ....................................................... 14

    C.   This Ancillary Action. ................................................. 15

        1.   The original complaint and motions to dismiss. .......... 15

        2.   The Amended Complaint. ......................................... 16

        3.   The dismissal order. .............................................. 16

III. STANDARDS OF REVIEW. ...................................................... 17

SUMMARY OF ARGUMENT ................................................................ 17

ARGUMENT ...................................................................................... 21

I. THE COURT SHOULD AFFIRM THE DISMISSAL OF ALL
CLAIMS AGAINST ATC UK AND MANOUKIAN FOR LACK OF
STANDING. ................................................................................. 21

    A.    *Isaiah* Bars the Receiver's Common Law Tort Claims
Against ATC UK and Manoukian (Responding to
Arguments (II)(A) and (II)(B)). .............................................. 21

           1.    *Isaiah* is controlling precedent. .................................... 22

           2.    The district court did not sua sponte raise an *in pari
delicto* affirmative defense. .......................................... 27

           3.    *Isaiah* does not permit the Receiver to allege magic
words to defeat dismissal. ............................................. 29

           4.    Any right to amend is waived and futile. ..................... 36

    B.    *Isaiah* Also Bars the Receiver's FUFTA Fraudulent
Transfer Claims Against ATC UK (Responding to
Argument (I)) .......................................................................... 39

II. THIS COURT CAN AFFIRM THE DISMISSAL WITH
PREJUDICE ON ALTERNATIVE GROUNDS. ................................ 44

    A.    The Gross and Simple Negligence Claims Against
Defendants Cannot Survive Because Defendants Owed
No Duty to the Receivership Entities. ................................... 45

    B.    No Claims Against ATC UK Can Survive Because the
District Court Lacked Personal Jurisdiction Over ATC
UK. ......................................................................................... 48

TABLE OF CONTENTS
(Continued)

**Page**

1.  The jurisdictional facts. ................................................ 48

2.  The district court lacks general jurisdiction over ATC UK. ........................................................... 52

3.  The district court lacks "minimum contacts" to support specific jurisdiction over ATC UK. ................ 57

III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DISMISSING WITH PREJUDICE WITHOUT LEAVE TO AMEND (RESPONDING TO ARGUMENT (IV)). ........................... 65

CONCLUSION ........................................................ 67

CERTIFICATE OF COMPLIANCE ....................................... 69

CERTIFICATE OF SERVICE ................................................ 70

# TABLE OF CITATIONS

**Page(s)**

**Cases**

*Asahi Metal Indus. Co. v. Superior Court of Cal.*,
480 U.S. 102 (1987) ............................................................. 63

*Aviation One of Fla., Inc. v. Airborne Ins. Consultants (PTY) Ltd.*,
722 F. App'x 870 (11th Cir. 2018) ...................................... 62

*Bank Hapoalim (Switz.) Ltd. v. xG Tech., Inc.*,
No. 8:07-cv-170-T-23MSS, 2008 WL 126583 (M.D. Fla.
Jan. 10, 2008) ..................................................................... 45

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) .................................................. 58, 60, 61

*Cail v. Joe Ryan Ent., Inc.*,
65 F. Supp. 3d 1288 (M.D. Ala. 2014) ................................ 56

*Curry v. TD Ameritrade, Inc.*,
662 F. App'x 769 (11th Cir. 2016) ...................................... 47

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) ........................................................... 53

*Davis v. Dollar Rent a Car Sys.*,
909 So. 2d 297 (Fla. Dist. Ct. Ap. 2005) ............................ 45

*Don't Look Media LLC v. Fly Victor Ltd.*,
999 F.3d 1284 (11th Cir. 2021) .......................................... 17

*Fey v. US Bank, N.A.*,
733 F. App'x 1002 (11th Cir. 2018) .................................... 37

*Freeman v. Dean Witter Reynolds, Inc.*,
865 So. 2d 543 (Fla. Dist. Ct. App. 2003) .................... *passim*

# TABLE OF CITATIONS
## (Continued)

**Page(s)**

2*Gater Assets Ltd. v. AO Moldovagaz,*
2 F.4th 42 (2d Cir. 2021) ................................................... 55

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
564 U.S. 915 (2011) ............................................................ 53

*Hertz Corp. v. Friend,*
559 U.S. 77 (2010) ......................................................... 53, 55

*Home Fed. Sav. & Loan Ass'n of Hollywood v. Emile,*
216 So. 2d 443 (Fla. 1986) ................................................ 46

*Insight Sec., Inc. v. Deutsche Bank Tr. Co. Americas,*
No. 21-12817, 2022 WL 2313980 (11th Cir. June 28, 2022) ............. 47

*Isaiah v. JPMorgan Chase Bank, N.A.,*
960 F.3d 1296 (11th Cir. 2020) .................................... *passim*

*Johnson v. SmithKline Beecham Corp.,*
724 F.3d 337 (3d Cir. 2013) ............................................. 55

*Kurlander v. Kaplan,*
No. 8:19-cv-00644-T-02CPT, 2019 WL 3944335 (M.D. Fla.
Aug. 21, 2019) ................................................................... 45

*Lamm v. State St. Bank & Tr.,*
749 F.3d 938 (11th Cir. 2014) ...................................... 46, 47

*Lawrence v. Bank of Am., N.A.,*
455 F. App'x 904 (11th Cir. 2012) ................................... 46

*Lewis Mech. Sales, Inc. v. Union Std. Ins. Grp., LLC,*
No. 2:16-CV-00496, 2017 WL 11246844 (S.D. Tex. No. 8,
2017) ................................................................................ 56

vi

*Long v. Satz,*
181 F.3d 1275 (11th Cir. 1999)................................20, 37, 65

*Martin v. United States,*
949 F.3d 662 (11th Cir. 2020).............................................28

*McCain v. Fla. Power Corp.,*
593 So. 2d 500 (Fla. 1992) ................................................45

*McCormack Family Charitable Found. v. Fid. Brokerage
Servs., LLC,*
195 A.D.3d 420 (N.Y. App. Div. 2021), *leave to appeal
denied*, 37 N.Y.3d 912, 175 N.E.3d 1258 (2021) ..........42, 43

*Newton v. Duke Energy Fla., LLC,*
895 F.3d 1270 (11th Cir. 2018)...........................................65

*O'Halloran v. First Union Nat'l Bank of Fla.,*
350 F.3d 1197 (11th Cir. 2003)....................................24, 47

*Oldfield v. Pueblo De Bahia Lora, S.A.,*
558 F.3d 1210 (11th Cir. 2009)....................................58, 59

*Perlman v. PNC Bank, N.A.,*
38 F.4th 899 (11th Cir. 2022) ....................................*passim*

*Regions Bank v. Kaplan,*
No. 17-15478, 2021 WL 4852268 (11th Cir. Oct. 19, 2021)...............47

*Richey v. Auto-Owners Ins. Co.,*
No. 2:19-cv-219-GMB, 2019 WL 2420401 (M.D. Ala. June
7, 2019) ......................................................................56

*Rush v. Savchuk,*
444 U.S. 320 (1980) ........................................................64

# TABLE OF CITATIONS
## (Continued)

**Page(s)**

*United States v. Bestfoods,*
   524 U.S. 51 (1998) .................................................................. 55

*Wagner v. Daewoo Heavy Industries America Corp.,*
   314 F.3d 541 (11th Cir. 2002) .............................................. 67

*Waite v. All Acquisition Corp.,*
   901 F.3d 1307 (11th Cir. 2018) ....................................... 57, 58

*Walden v. Fiore,*
   571 U.S. 277 (2014) ........................................................ 62, 64

*Werbowsky v. Collomb,*
   766 A.2d 123 (Md. 2001) ....................................................... 45

*Wiand v. Lee,*
   753 F.3d 1194 (11th Cir. 2014) ........................ 17, 21, 40, 41

*Wright v. Stryker Corp.,*
   No. 2:19-cv-2877, 2020 WL 1290245 (S.D. Ohio Mar. 18,
   2020) ..................................................................................... 53

*Wylie v. Red Bull N. Am., Inc.,*
   627 F. App'x 755 (11th Cir. 2015) ...................................... 56

## Statutes

§ 726.102(14), Fla. Stat. ........................................................ 41

§ 726.105(1)(a), Fla. Stat. ....................................................... 5

§ 726.105(1)(b), Fla. Stat. ....................................................... 5

§ 726.106(1), Fla. Stat. ........................................................... 5

# TABLE OF CITATIONS
## (Continued)

**Page(s)**

**Other Authorities**

Fed. R. Civ. P. 7(b) ........................................................................... 65

Fed. R. Civ. P. 59(e) ............................................................. 16, 39, 66

## JURISDICTIONAL STATEMENT

ATC UK and Manoukian do not dispute the Receiver's statement on appellate jurisdiction. *See* Initial Br. of Receiver (RB) at xiii. ATC UK and Manoukian also do not dispute that this appeal arises from an action ancillary to the receivership action, but they do dispute the district court's subject matter jurisdiction because the Receiver lacked standing to pursue claims against them, as explained below.

## STATEMENT OF THE ISSUES

1.      *Isaiah* bars for lack of standing claims that receivers bring on behalf of receivership entities that operated as sham corporations. Should the Court accept the Receiver's invitation to abandon its precedent where the entities the Receiver represents were not separate and distinct from the fraudulent Ponzi scheme their principals set up and controlled?

2.      Even if *Isaiah*'s standing analysis does not apply to the Receiver's fraudulent transfer claims against ATC UK, does *Isaiah*'s alternative analysis still apply to bar those claims because deposits made into omnibus accounts at ATC UK were not "transfers" under the Florida Uniform Fraudulent Transfer Act (FUFTA)?

3.      Should the Receiver's negligence claims be dismissed on the alternative ground that ATC UK and its principal, Manoukian, owed no duty to the Receivership Entities to monitor their trades?

4.      Should every claim against ATC UK, a U.K. company doing business overseas, be dismissed on the alternative ground of lack of personal jurisdiction?

5.     Should the Court permit the Receiver to present an argument that the district court abused its discretion in refusing to grant leave to amend when the Receiver did not preserve this argument?

## STATEMENT OF THE CASE AND FACTS

## I.     STATEMENT OF THE CASE.

This case arises out of a Ponzi scheme certain individuals orchestrated through foreign entities they "controlled" and "caused . . . to operate as one common enterprise."  (R:36:2, 7, 18).  ATC UK ***was not*** one of those entities, and Manoukian ***did not*** work for or control any of them.  (R:36:8-11).

The Ponzi schemers solicited money from their clients for pooled investments to be traded on foreign exchange (FOREX) markets with the promise of high rates of return.  (R:36:17-20).  The Ponzi schemers did not live up to their promise.  (R:36:22-25).  Instead, they traded a fraction of the funds their clients invested, did so at a loss, paid themselves, and made fictious return payments to early investors while leaving later investors with nothing.  (R:36:24, 33).

Federal criminal charges were filed against two of the principals who orchestrated the Ponzi scheme; one pleaded guilty. (R:36:3-5).[1] In another case, the Commodity Futures Trading Commission (CFTC) sued the fraudulent Ponzi scheme entities and their principals. (R:36:2-3). The Ponzi scheme entities were placed into receivership, and the district court appointed the Receiver, who was granted authority to stand in the shoes of the Ponzi scheme entities (the Receivership Entities) and pursue recovery actions on the Receivership Entities' behalf. (R:36:5-6). CFTC has never alleged any wrongdoing by ATC UK or its principals. (R:43:6).

This appeal relates to a distinct case, an ancillary action the Receiver filed against ATC UK and one of its principals, Manoukian. (R:36:1-2).[2] ATC UK, a British company incorporated, registered, and regulated in the U.K., offers brokerage solutions for third-party companies to trade on London-based FOREX markets. (R:36:8; R:43:3). The Ponzi schemers opened omnibus trading accounts at ATC UK to perpetrate their fraudulent scheme unbeknownst to ATC UK and Manoukian. (R:43:1-3). Using the accounts, the schemers engaged in

[1] The other was found guilty following a trial.

[2] The Receiver also named Spotex LLC (Spotex) as a defendant. Spotex is represented by different counsel and filed a separate brief.

FOREX trading for their underlying investor clients, who had no relationship with ATC UK, and ultimately lost almost all the money placed for trading.  (R:43:4; R:36:24, 31, 35).

In the ancillary action, the Receiver sued ATC UK and Manoukian for damages and alleges they knew or should have known about, and, therefore, could have prevented, the Ponzi schemers' fraud.  (R:36:48).  The Receiver brought common-law tort claims for aiding and abetting fraud and breaches of fiduciary duties (Counts I and II) and gross and simple negligence (Counts VI and VII) against ATC UK and Manoukian.  (R:1:38-41, 45-48).  The Receiver also brought claims for fraudulent transfers under sections 726.105(1)(a) and (b) and 726.106(1), Florida Statutes, of FUFTA (Counts III, IV, and V) against ATC UK alone.  (R:1:41-45).

Manoukian moved to dismiss the Receiver's action for lack of standing (among other deficiencies) based on *Isaiah*, which bars a receiver from pursuing claims against third parties like ATC UK and Manoukian to recover damages for fraud perpetrated by the receivership entities' insiders.  (R:25:9-12).  ATC UK moved to dismiss the Receiver's action for lack of personal jurisdiction.  (R:24).  Rather than respond, the

Receiver filed an amended complaint that he asserts "fully addresse[d] and fully resolve[d] – in the Receiver's favor – the various arguments raised by Defendants." (R:36:1-2 n.1).

Because it did not, ATC UK and Manoukian moved to dismiss a second time. (R:42, 43). The district court agreed, granted the motions, and dismissed with prejudice. (R:67). Because the district court ruled the Receiver lacked standing under *Isaiah*, which was dispositive of all claims, the order did not reach the remaining grounds for dismissal. (R:67:24-29). This appeal follows.

## II. STATEMENT OF FACTS.

### A. The Oasis Entities' Fraudulent Plan.

#### 1. The Ponzi scheme.

The Receiver only has authority to pursue claims for injury to the Receivership Entities—*i.e.*, the Ponzi scheme entities—which are Oasis International Group, Limited (OIG), Oasis Management, LLC (OM), Satellite Holdings Company (Satellite Holdings), and their affiliated entities. (R:36:1, 5-6).

OIG, OM, and Satellite Holdings operated as commodity pool operators (or CPOs), and they solicited, received, and accepted funds from pool participants (*i.e.*, their investor clients) for investments in "Oasis

Pools." (R:36:7). The Oasis Pools were two FOREX commodity pools: (1) Oasis Global FX, Limited (OGNZ), a New Zealand registered and licensed corporation; (2) and Oasis Global FX, S.A. (OGBelize), a Belizean registered and licensed corporation. (R:36:2, 7-8, 18). The Receiver refers to the Oasis Pools, together with OIG, OM, and Satellite Holdings, as the "Oasis Entities." (R:36:2-3).

The Receiver alleges the "CFTC Defendants caused OIG, OM and Satellite Holdings to act as CPOs of the Oasis Pools." (R:36:20). The Receiver defines the "CFTC Defendants" as the following individuals: Michael J. DaCorta; Joseph S. Anile, II; Francisco L. Duran; John J. Haas; and Raymond P. Montie, III. (R:36:2). The Receiver alleges that CFTC Defendants DaCorta, Anile, and Montie "owned and controlled" "the principal entity used to perpetrate the Ponzi scheme." (R:36:17-18).

Between late 2013 to April 2019, "the CFTC Defendants fraudulently solicited more than 700 investors . . . to invest more than $78 million in OIG, OM, and Satellite Holdings for purposes of investing in pooled investments in retail [FOREX] in the [Oasis Pools]." (R:36:18). The CFTC Defendants used the Oasis website that the Oasis Entities shared to attract potential investors. (R:36:35). Among other things, the

CFTC Defendants promised their client investors high rates of return. (R:36:19, 22).

Instead, "the CFTC Defendants operated the Oasis Entities as a Ponzi scheme with OIG as the principal entity used to perpetrate the Ponzi scheme." (R:36:18). "The CFTC Defendants were supposed to trade all investor-derived funds in [FOREX] for the benefit of investors," but they only traded "a small fraction of the funds" and "lost every penny traded." (R:36:19-20, 24, 33). The CFTC Defendants also "misappropriated (a) more than $28 million to make fictious redemption or return payments to [earlier] investors . . . and (b) more than $10 million to pay themselves, their insiders, [and] their employees or agents." (R:36:24).

Criminal charges eventually were filed against Anile and DaCorta relating to OIG and the Oasis Pools in two separate federal cases. (R:36:3). Anile pleaded guilty. (R:36:3-4).

## 2. The CFTC Defendants controlled the Oasis Entities as sham corporations.

The Amended Complaint details the Receivership Entities (*e.g.*, OIG, OM, Satellite Holdings, and the Oasis Pools) as the centerpiece of a Ponzi scheme enterprise controlled exclusively by the persons engaged in

the scheme—*i.e.*, the CFTC Defendants. (R:36:1-2, 7, 18, 20, 27).
Regarding the CFTC Defendants' actions and operations, specifically, the
Receiver alleges the following:

- "[T]he CFTC Defendants operated the Oasis Entities as a Ponzi
  scheme with OIG as the principal entity used to perpetrate the
  Ponzi scheme" (R:36:18);

- "[T]he CFTC Defendants . . . controlled" OIG, OM, and Satellite
  Holdings (R:36:2);

- "As part and parcel of the Ponzi scheme, the CFTC Defendants
  caused OIG, OM, and Satellite Holdings to (a) share the same office
  and employees; (b) commingle their funds; and (c) operate under the
  common 'Oasis' trade name" (R:36:18);

- "[T]he CFTC Defendants caused OIG, OM and Satellite Holdings to
  act as CPOs of the Oasis Pools . . . ." (R:36:20);

- "[T]he Oasis Pools were being operated by OIG through the
  management of DaCorta and Anile . . . ." (R:36:27);

- "Anile, DaCorta and Montie owned and controlled OIG and served
  as its Board of Directors" (R:36:7); and

- "[T]he CFTC Defendants caused the Oasis Entities to operate as one common enterprise through their own interrelated entities" (R:36:18).

The Receiver also alleges that "the CFTC Defendants raised funds from innocent investors through several forms of securities." (R:36:18).

One form of investment security was the purchase of common shares that would be redeemed over time for cash. (R:36:18-19). For example, six "shareholders" invested by taking ownership of less than 10% of OIG's "common shares." (R:36:18). The Receiver says these shareholders were "innocent and honest," but he does not allege this minority-share investment vehicle gave them any control or management over OIG. (R:36:18-19).

Another form of investment security was the purchase of "non-voting" preferred shares for an annual return or for redemption via "cash and/or promissory notes." (R:36:19-20). For example, more than sixty "preferred shareholders" chose this option to invest through OIG. (R:36:19). The Receiver also says that these shareholders were "innocent and honest," but he does not allege this "non-voting" investment vehicle gave them any control or management over OIG either. (R:36:19).

The final form of investment security was entering into a promissory note and loan agreement. (R:36:20). The Receiver provides no examples of this type of investment, but he still says "[t]hese investors were also completely innocent." (R:36:20). Here, too, the Receiver does not allege this investment vehicle gave investors any control or management over OIG (and, logically, he could not). (R:36:19-20).

### 3. ATC UK's and Manoukian's alleged third-party roles.

The Oasis Entities needed a brokerage firm at which they could open omnibus FOREX trading accounts and obtain liquidity to trade on behalf of their clients. (R:36:25). This is where ATC UK and Manoukian came into the picture.

As a foreign FOREX brokerage firm, ATC UK provided the Oasis Entities with a third-party mechanism to serve as a broker, in their own right, for their underlying investor clients' money. (R:36:25). ATC UK, which is incorporated in the UK and headquartered in London, serves as a brokerage firm for its customers to trade on London-based FOREX markets. (R:43-1:1; R:43-2:2). Manoukian, a resident of California, was one of ATC UK's principals. (R:36:8-10).

The Oasis Entities opened two omnibus trading accounts with ATC UK, one for each of the two Oasis Pools, to engage in FOREX trading through foreign financial institutions.  (R:36:33-34; R:43:4 & n.2).  ATC UK opened the accounts for the Oasis Pools after receiving applications from each, and the Oasis Pools had been registered with their respective countries' authorities as licensed brokers.  (R:36:26-27; R:43-2:3).

The CFTC Defendants were supposed to deposit their underlying investor clients' money into the Oasis Pools accounts at ATC UK for trading.  (R:36:24, 33-34, 43).  CFTC Defendant DaCorta—labeled by the Receiver as "Oasis co-founder and Chief Investment Officer" and one of OIG's three owners and controllers—"was the sole authorized trader for th[ese] account[s]" and the person who engaged in the "trading activities" and "losses."  (R:36:4, 7, 24, 34-36, 38, 39, 49, 50, 51).  ACT UK did *not* make trading decisions, and it had *no* relationship with the Oasis Entities' investor clients.  (R:43-1:2; R:55-5:44).

As part of the process by which the CFTC Defendants allegedly perpetrated their scheme, the Oasis Entities used a "white label" brokerage software solution provided by ATC UK that allowed the Oasis Pools to brand the software as their own with an Oasis logo and act as

FOREX brokers for their underlying investor clients. (R:36:25-26, 36; R:43-1:2).

ATC UK allegedly "affiliate[ed]" with Spotex to provide the Oasis-branded "white label" software, which "generate[d] online account records with various back-office tasks." (R:36:25-26, 35). This was the same setup and back-office software that all of ATC UK's omnibus broker clients received. (R:43-1:2). But the Oasis Entities, through the CFTC Defendants, manipulated the reporting data their underlying investor clients could view on the investor-facing side of the software to give "the illusion of continuous investment earnings" and to "conceal[] the trading losses." (R:36:36-43).

ATC UK ultimately froze the Oasis-affiliated accounts upon request by and in cooperation with the National Crime Agency in the U.K. (R:43-2:4; R:36:31 n.5, 35). "[A]pproximately $2 million in cash . . . had not been deployed for trading" and "remained in" one of the Oasis Pool accounts at ATC UK. (R:36:31 n.5, 35). Those remaining Oasis Pool account "funds are in the process of being repatriated from the U.K. for the benefit of the Receivership Estate." (R:36:31 n.5, 35).

## B.    The CFTC Action.

In April 2019, CFTC sued the Oasis Entities, their principals (*i.e.*, the CFTC Defendants), and several companies associated with the Oasis Entities (the CFTC Action).  (R:42:5 & n.9).[3]  Neither ATC UK nor any of its principals were named as defendants or relief defendants by CFTC.  (R:42:5 & n.10).  CFTC alleged the Oasis Entities placed trades and lost almost all the money placed for trading through the ATC UK omnibus accounts.  (R:42:5 & n.11).  CFTC never alleged any wrongdoing by ATC UK or any of its principals.  (R:42:5).

The district court appointed the Receiver in the CFTC Action and entered orders authorizing the Receiver to pursue suits that could be brought by the Receivership Entities.  (R:36:5-6).  The Receiver has no authority to sue on behalf of the Oasis Entities' defrauded investor clients or serve as a class representative on their behalf.

---

[3] The Amended Complaint cites extensively to filings in the CFTC Action, and, consequently, the district court properly relied on such filings. (R:67:2 n.2).

## C.    This Ancillary Action.

### 1.    The original complaint and motions to dismiss.

The Receiver sued ATC UK and Manoukian on behalf of the Receivership Entities. (R:1). The Receiver's original complaint sought to recover (1) damages caused by their alleged "acts or omissions" and participation in the Ponzi scheme outlined in the CFTC Action, and (2) "funds that the CFTC Defendants, the Ponzi scheme operators, caused the Oasis Entities to transfer to ATC [UK]." (R:1:6).

Against both ATC UK and Manoukian, the Receiver brought common-law tort claims for aiding and abetting fraud and breaches of fiduciary duties (Counts I and II) and gross and simple negligence (Counts VI and VII). (R:1:38-41, 45-48). And against ATC UK alone, the Receiver brought three statutory claims under FUFTA for fraudulent transfers (Counts III, IV, and V). (R:1:41-45).

Manoukian moved to dismiss on standing grounds, among others, and argued this Court's decision in *Isaiah* was dispositive. (R:25:9-12). ATC UK, a U.K.-based entity only doing business abroad, moved to dismiss on personal jurisdiction grounds. (R:24).

### 2. The Amended Complaint.

The Receiver did not respond to ATC UK's and Manoukian's dismissal motions. (R:36:1-2 n.1). Instead, the Receiver filed the Amended Complaint, asserting the same seven causes of action and representing that his amendment "fully addresse[d] and fully resolve[d]—in [his] favor—the various arguments [Defendants] raised." (R:36:1-2 n.1).

### 3. The dismissal order.

ATC UK and Manoukian again moved to dismiss the Amended Complaint on the same grounds. (R:42, 43). After full briefing, the district court dismissed all claims with prejudice, ruling the Receiver lacked standing under *Isaiah* because he did not allege the CFTC Defendants operated the Oasis Entities "as separate and distinct entities." (R:67:27-28). The district court did not reach the remaining arguments. (R:67:29).

The Receiver did not file a motion for leave to amend or submit a proposed pleading that would cure the Amended Complaint's legal deficiencies. Nor did the Receiver move for relief pursuant to Federal Rule of Civil Procedure 59(e) after the order was entered to bring to the district court's attention an argument he (and the amicus) address here—

*i.e.*, that the *Isaiah* standing bar does not apply to the fraudulent transfer claims against ATC UK under *Wiand v. Lee*, 753 F.3d 1194 (11th Cir. 2014). Instead, the Receiver filed this appeal and raises that argument for the first time.

## III. STANDARDS OF REVIEW.

The Receiver correctly states the standard that governs this Court's review of the district court's dismissal with prejudice. *See* RB at 11.

ATC UK also seeks affirmance of its dismissal on the alternative ground of lack of personal jurisdiction. This Court reviews de novo a dismissal for lack of personal jurisdiction. *Don't Look Media LLC v. Fly Victor Ltd.*, 999 F.3d 1284, 1292 (11th Cir. 2021). When a defendant submits an affidavit contesting the basis for personal jurisdiction, "the burden shifts back to the plaintiff to produce evidence to support personal jurisdiction." *Id.*

## SUMMARY OF ARGUMENT

1.   This Court should reject the Receiver's request to abandon *Isaiah* and transform this ancillary action into a class action lawsuit filed on behalf of Ponzi scheme victims the Receiver does not represent. The Receiver's allegations resolve this. In paragraph after paragraph, the

Receiver establishes that the Receivership Entities were sham companies wholly dominated by the CFTC Defendant wrongdoers, and there was no distinction between them. Under *Isaiah*, these allegations bar the Receiver's tort claims for lack of standing.

It does not matter that at least one of the Receivership Entities, OIG, allegedly had passive (yet "honest") investors purchase shares in the company as a form of investing funds for trading purposes. Those investors had no corporate role or management position at, or control over, OIG at all. In the Receiver's own words, *Isaiah* demands dismissal here because the Receiver alleged the Receivership Entities lacked "any innocent decision-maker in the management of the corporation." RB at 29 (citation omitted).

2.     *Isaiah* still bars the fraudulent transfer claims for a different reason. There, the Court held that the transactions like those at issue here, in which the Receivership Entities deposited funds into ATC UK omnibus accounts, only qualify as "transfers" under FUFTA if ATC UK exerted control over the funds in those accounts. ATC UK did not; DaCorta, an Oasis co-founder did. Because ATC UK had no

responsibility in deciding how funds in the Oasis Pools accounts were deployed, ATC UK cannot be liable under FUFTA.

3.     The Court could also affirm the dismissal of the gross and simple negligence claims on alternative grounds.  Neither Manoukian nor ATC UK owed the Receivership Entities a duty of care.  Manoukian, a principal of ATC UK, only owed a duty to ATC UK.  And ATC UK had no duty to police or protect the trades DaCorta decided to make for the Oasis Entities' underlying clients.  Without a legal duty, the gross and simple negligence claims fail as a matter of law.

4.     All else aside, the Court can affirm the dismissal of every claim against ATC UK for lack of personal jurisdiction.  The Receiver failed to meet his burden to demonstrate otherwise after ATC UK submitted evidence disputing his jurisdictional allegations.  Because the evidence shows ATC UK is incorporated and based in the U.K., the court lacks general jurisdiction over it.  And because ATC UK's only relation to this matter was conducting legitimate foreign business with licensed, foreign broker dealers, the court also lacks specific jurisdiction over it. Haling a British company providing a regulated financial service in non-

U.S. markets into a U.S. court offends traditional notions of fair play and substantial justice.

5.     Finally, the Receiver cannot be heard to complain about the district court's refusal to grant him leave to amend because he failed to timely preserve the request to do so, as required by *Long v. Satz*, 181 F.3d 1275 (11th Cir. 1999). The Receiver did not file a motion for leave or detail the substance of his proposed amendment when he had the chance. His failure to do either means he cannot pursue this argument on appeal.

## ARGUMENT

## I. THE COURT SHOULD AFFIRM THE DISMISSAL OF ALL CLAIMS AGAINST ATC UK AND MANOUKIAN FOR LACK OF STANDING.

The Receiver tactically addresses the FUFTA claims under *Lee* first, even though the district court resolved all claims against ATC UK and Manoukian on standing grounds under *Isaiah*. ATC UK and Manoukian address *Isaiah* standing first. Under *Isaiah*, the Receiver cannot pursue his tort claims against either, but the case also prevents the Receiver from pursuing his FUFTA claims against ATC UK. Because *Isaiah* resolves this case entirely against the Receiver, regardless of the district court's reasoning, the Court should affirm the dismissal.

### A. *Isaiah* Bars the Receiver's Common Law Tort Claims Against ATC UK and Manoukian (Responding to Arguments (II)(A) and (II)(B)).

The Receiver does not dispute this Court's decision in *Isaiah* bars a receiver's common-law tort claims against third-party defendants under certain circumstances. *See* RB at 12, 14, 22-23. Nor could it. *Isaiah* settles this. To avoid the only result a straightforward application of *Isaiah* requires—with respect to Counts I, II, VI, and VII against Manoukian *and* ATC UK, at a minimum—the Receiver does two things. First, the Receiver intentionally conflates his clear lack of standing with

21

an *in pari delicto* affirmative defense. And second, the Receiver elevates form over substance. He restricts *Isaiah* to allow tort claims to survive dismissal every time the magic words "innocent and honest shareholder," without more, are alleged. Both the Receiver's arguments seek to rewrite *Isaiah*, which provides this Court with a clear pathway for affirmance.

### 1. *Isaiah* is controlling precedent.

This discussion begins (and should end) with *Isaiah* because it is on point and controlling precedent. There, a court-appointed receiver filed a complaint against a third-party bank in connection with its alleged enablement of a Ponzi scheme. *Isaiah*, 960 F.3d at 1300. The Ponzi scheme was orchestrated by the principals of the entities in receivership, which had "solicited investors by promising astronomical returns on investments supposedly involving the trade of Venezuelan and U.S. currency." *Id.* "The Ponzi schemers operated this fraudulent scheme, in part, by depositing investments into and making 'distributions' from several . . . bank accounts belonging to the [r]eceivership [e]ntities." *Id.*

Like what the Receiver alleges about ATC UK here, the receiver in *Isaiah* alleged the bank "failed to follow sound banking practices and willfully ignored suspicious banking activity, and thus knowingly

encouraged the Ponzi schemers' tortious conduct by providing a platform for them to carry out their illicit scheme." *Id.* at 1301. The receiver brought claims against the bank for, among other things, aiding and abetting the principals' breach of fiduciary duty, conversion, and fraud. *Id.* The receiver sought to recover from the bank the "funds that were fraudulently deposited into, withdrawn from, and transferred among" the receivership entities' bank accounts. *Id.*

The district court dismissed the complaint, and this Court addressed whether the principals' fraudulent acts were imputed to the receiver under Florida law. *Id.* at 1305. In other words, the Court had to resolve whether the receiver had standing to assert tort claims against third parties on behalf of the receivership entities when the entities were "tarred by the fraudulent acts of the Ponzi schemers." *Id.* The Court said *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543 (Fla. Dist. Ct. App. 2003), supplied the "exact" answer. *Isaiah*, 960 F.3d at 1306.

*Freeman* was another Ponzi scheme case. The receiver there similarly alleged that third-party defendants "had a legal obligation to take steps to prevent economic losses resulting from the Ponzi scheme." 865 So. 2d at 547. Two of the defendants were a brokerage firm and its

employee, and they provided the receivership entity with money market and stock/margin accounts into which the fraudulent entity deposited investor funds. *Id.* The receiver argued the defendants "knew or should have known that these . . . deposits . . . violated the promises [the entity] was making to its customers." *Id.* The court held the receiver lacked standing to pursue tort claims on behalf of the receivership entity because that entity "was entirely the robot or the evil zombie of the corporate insiders." *Id.* at 551, 553.

Central to the court's reasoning in *Freeman* was "[t]he distinction between an honest corporation with rogue employees, which can pursue claims for the fraud or intentional torts of third parties while in receivership, and a sham corporation created as the centerpiece of a Ponzi scheme, which cannot pursue such claims." *Id.* at 552. If the receivership entity's "primary existence" before the receivership "was as a perpetrator of the Ponzi scheme," it was not an honest corporation and could not "be said to have suffered injury from the scheme it perpetrated." *Id.* (quoting *O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1203 (11th Cir. 2003)). For the receiver to overcome dismissal of his tort claims against the third-party defendants, the receiver would be required to

allege the receivership entity "is separate and distinct from [the] intentional tortfeasors", *i.e.*, the corporate insiders. *Id.* at 551. This inquiry focuses on the presence of an innocent decision-maker "within the corporation to whom [fraudulent] conduct could be reported." *Id.* at 552.

The receiver could not overcome this hurdle in *Freeman* because the receivership entity "was not a large corporation with an honest board of directors and multiple shareholders, suffering from the criminal acts of a few rogue employees in a regional office." *Id.* at 551. Instead, it "was controlled exclusively by persons engaging in its fraudulent scheme and benefiting from it" who "created" the company "to dupe the customers." *Id.* The receivership entity was the "robot or zombie" controlled by the schemers, so reporting the scheme would accomplish nothing. *Id.* at 552. Therefore, it was not the receivership entity, but the duped customers, who suffered injury as a result of the Ponzi scheme, and it was the customers alone who could potentially pursue tort claims. *Id.* at 553.

Returning to *Isaiah*, this Court held that *Freeman* was "indistinguishable" and mandated the same result. *Isaiah*, 960 F.3d at 1307. As in *Freeman*, "the Ponzi schemers' torts [could not] be separated from the [r]eceivership [e]ntities" because those entities were not "honest

corporations injured by the actions of a few corrupt employees." *Id.* at 1307-08. "The complaint itself showe[d] that the [r]eceivership [e]ntities were wholly dominated by persons engaged in wrongdoing and [was] devoid of any allegation that the [r]eceivership [e]ntities engaged in any legitimate activities or had 'at least one honest member of the board of directors or an innocent stockholder.'" *Id.* at 1307 (quoting *Freeman*, 865 So. 2d at 551). The tort claims did not belong to the receiver because he lacked standing; "they belong[ed] to the defrauded investors, whom [the receiver did] not represent." *Id.* at 1308.

This Court revisited *Isaiah* in *Perlman v. PNC Bank, N.A.*, 38 F.4th 899 (11th Cir. 2022), which recognized that *Isaiah* demands a receiver to stand in the shoes of an "honest corporation" to overcome dismissal:

> The "axiomatic" principle from *Isaiah* is "that a receiver obtains only the rights of action and remedies that were possessed by the person or corporation in receivership." [*Isaiah*, 960 F.3d] at 1306. If the corporation in receivership is one that is operated for the sole purpose of committing fraud, and thus not an "honest corporation," then that corporation "cannot be said to have suffered an injury from the scheme it perpetrated." *Id.* at 1306. Since the receiver "obtains only the rights of actions and remedies" of the corporation in receivership, it follows that the receiver likewise would not have suffered an injury for purposes of bringing such claims.

*Perlman*, 38 F.4th at 904.

## 2. The district court did not sua sponte raise an *in pari delicto* affirmative defense.

The Receiver's first *Isaiah* argument should be easily discarded. The Receiver incorrectly reframes *Isaiah* as embracing an *in pari delicto* affirmative defense to make way for his argument that the district court prematurely (and sua sponte) invoked that defense as grounds for dismissing his tort claims. RB at 25-28, 38-39. The fatal flaw in the Receiver's position, however, is that *Isaiah* is **not** an *in pari delicto* case.

To the contrary, the Court in *Isaiah* expressly acknowledged the difference between standing, upon which its decision was based, and the doctrine of *in pari delicto*, which had no bearing on the outcome: "Like in *Freeman*, [the receiver's] ability to pursue these claims is barred **not by the doctrine of in pari delicto**, but by the fact that the [r]eceivership [e]ntities were controlled exclusively by persons engaging in and benefitting from the Ponzi scheme." *Isaiah*, 960 F.3d at 1308 (emphasis added). The Receiver disregards this language in *Isaiah* because it defeats his argument. The Receiver's grievance about ATC UK and Manoukian having "never asserted the defense" of *in pari delicto* (RB at 27-28) ultimately does not matter; the case was due to be dismissed under the authority of *Isaiah* on standing grounds.

The language of *Isaiah* does not fully resolve the Receiver's related challenge to the district court's decision to use *Isaiah* to dismiss the tort claims against ATC UK, rather than just Manoukian. *See* RB at 28. But that challenge does not matter either. Even if ATC UK did not raise a standing challenge below, this Court still "can affirm on any basis supported by the record." *Isaiah*, 960 F.3d at 1305 n.7 (quoting *Martin v. United States*, 949 F.3d 662, 667 (11th Cir. 2020)).[4] This is true regardless of the district court's reasoning. *Id.*

For purposes of this discussion, the important thing is that the Receiver never once argues the standing bar in *Isaiah* applies differently to Manoukian versus ATC UK. And he could not. *Isaiah* bars claims that receivers bring against third parties, in general, and both Manoukian and ATC UK are third-party defendants. If (or because) the Receiver cannot pursue his tort claims against Manoukian under *Isaiah*, he cannot pursue the same tort claims against ATC UK under *Isaiah* either.

---

[4] Indeed, the dispositive standing argument in *Isaiah* was raised by the Court at oral argument and supplied a basis to affirm the dismissal on grounds different than the district court. *Id.* at 1305 & n.7.

### 3. *Isaiah* does not permit the Receiver to allege magic words to defeat dismissal.

The Receiver's second *Isaiah* argument focuses on standing because he strategically sprinkles the Amended Complaint with the meaningless phrase "innocent and honest shareholders" to try to avoid dismissal. The Receiver's position improperly elevates form over substance in an attempt to rewrite *Isaiah*'s central holding.

There is no serious question the Receivership Entities do not constitute "honest corporations" separate and distinct from their insiders, the CFTC Defendants. The Receiver alleges as much. The CFTC Defendants were not simply "rogue employees" in a "large corporation" acting without approval of management; they were the actual Ponzi schemers who "wholly dominated" the Receivership Entities and allegedly operated them for no legitimate purpose.

The Receiver's allegations prove this point. The Receiver alleges (and even maintains on appeal) that the "CFTC Defendants . . . controlled" OIG, OM, and Satellite Holdings, they "caused the Oasis Entities to operate as one common enterprise through their own interrelated entities," they "operated the Oasis Entities as a Ponzi scheme with OIG as the principal entity used to perpetrate the Ponzi

scheme," and three of the CFTC Defendants, "Anile, DaCorta and Montie[,] owned and controlled OIG and served as its Board of Directors." (R:36:2, 7, 18). These allegations demonstrate the Receivership Entities that the Receiver has stepped into the shoes of were nothing more than "sham corporation[s] created as the centerpiece of a Ponzi scheme, which cannot pursue [tort] claims" against ATC UK and Manoukian. *Isaiah*, 960 F.3d at 1307 (quoting *Freeman*, 865 So. 2d at 552).

The Receiver argues the way the CFTC Defendants operated the Receivership Entities does not deprive him of standing because he also alleges the Receivership Entities have "innocent and honest shareholders." RB at 28-33. The Receiver only ever focuses on the alleged shareholders of just one of the Receivership Entities, OIG, and he fails to address how this argument would apply to any other Receivership Entities, including OM and Satellite Holdings. *See* RB at 7-8, 31-38.[5] In

---

[5] The Receiver does not mention that in the Amended Complaint he also alleges OM had "innocent and honest" shareholders with interests that were "redeemed with cash over time." (R:36:20 n.4). The Receiver's failure to discuss OM on appeal does not make a difference because the same analysis applies to bar the Receiver's tort claims on OM's behalf. Unlike OM, the Amended Complaint does not allege Satellite Holdings had any shareholders—much less "innocent and honest" ones. *Isaiah* clearly bars any torts claims the Receiver seeks to pursue on behalf of Satellite Holdings.

any event, the Receiver's mere incantation of this phrase, standing alone, cannot override his failure to establish standing under the facts he alleges in this case.

To begin with, the Receiver's position incorrectly narrows the scope of the *Isaiah* standing bar. The Receiver agrees *Isaiah*'s reasoning "stems from *Freeman*." RB at 28. *Freeman* requires a receiver to stand in the shoes of an "honest corporation" for tort claims against third parties to survive dismissal. 865 So. 2d at 552; *see also Perlman*, 38 F.4th at 904 ("If the corporation in receivership is . . . not an 'honest corporation,' then that corporation 'cannot be said to have suffered an injury from the scheme it perpetrated.'" (quoting *Isaiah*, 960 F.3d at 1306)).

By contrast, "a sham corporation created as the centerpiece of a Ponzi scheme" cannot pursue such claims because the misconduct is imputed to the receiver. *Freeman*, 865 So. 2d at 552. The distinction between the two depends on the answer to a straightforward question: is the receivership entity "separate and distinct from [the] intentional tortfeasors," *i.e.*, the corporate insiders? *Id.* at 551. If the receivership entity "was controlled exclusively by persons engaging in its fraudulent

scheme and benefiting from it," then the answer to that question is no, and the receiver lacks standing to bring tort claims on its behalf. *Id.*

The Receiver places all his stock in language from *Freeman*, *Isaiah*, and *Perlman* indicating that the allegation of a receivership entity with "at least one honest member of the board of directors or an innocent stockholder" may lead to the opposite answer. *See* RB at 12, 29-33. The isolated language the Receiver excises from those cases, however, does not (and could never) create the categorical pleading rule he endorses—namely, a simple allegation that sham corporations also had "innocent and honest shareholder" investors allows the Receivership Entities to benefit from or be rewarded for their fraudulent scheme and "usurp the claims that properly belong to [their] creditors." *Isaiah*, 960 F.3d at 1310. This type of allegation cannot avoid dismissal for lack of standing under *Freeman*, *Isaiah*, or *Perlman*.

Contrary to the Receiver's position, the language the Receiver cites from the *Freeman* line of cases merely is a shorthand way to describe an "honest corporation[] injured by the actions of a few corrupt employees" who perpetrated the fraud. *Isaiah*, 960 F.3d at 1308; *see also Freeman*, 865 So. 2d at 551 (acknowledging that the receivership entity "was not a

large corporation with an honest board of directors and multiple shareholders, suffering from the criminal acts of a few rogue employees in a regional office"). That description does not broaden or redefine the standing bar to open the door for a ***dishonest*** corporation "controlled exclusively by persons engaging in its fraudulent scheme and benefiting from it" to benefit from claims brought on its behalf. *Isaiah*, 960 F.3d at 1307. Two considerations make that point patent.

First, examine the Receiver's allegations. *See* RB at 31. The clients who invested in the CFTC Defendants' Ponzi scheme and knew nothing about the fraud are obviously "innocent." (R:36:18). But this does not make the Receivership Entities CFTC Defendants DaCorta, Anile, and Montie "owned and controlled" "honest."

To invest their "funds," six people purchased less than 10% (or, ***a clear minority***) of OIG common stock during an undefined time period, and sixty people purchased "***non-voting*** OIG preferred shares" between 2013 and 2017. (R:36:18-20) (emphasis added).[6] As the district court

---

[6] The Receiver intentionally avoids alleging when the common shares were purchased and redeemed. Of course, if those shares were purchased and redeemed ***before*** the tortious conduct the Receiver alleges occurred, then they could not support standing in any event.

correctly observed, the Receiver "does not allege anywhere in the Amended Complaint that any innocent . . . investors had any ownership control or had further involvement in OASIS" by virtue of these stock purchases. (R:67:28).

OIG's investors may have technically owned "shares" of the company at some point in time. This is just semantics; it does not make the Receivership entities "honest corporations injured by the actions of a few corrupt employees." *Isaiah*, 960 F.3d at 1307-08.

Even the Receiver agrees that *Freeman*'s standing bar focuses on "the presence of ***any innocent decision-maker in the management*** of a corporation." RB at 29 (emphasis added) (citation omitted). If (or because) OIG's non-voting, passive investors had no role in the "management" of OIG, it made no difference to the CFTC Defendants' fraudulent scheme.

Accepting the Receiver's logic would mean the Receivership Entities (or at least OIG) were both "honest" and a "sham" simultaneously. Surely, OIG had to be one or the other. Companies like the Receivership Entities, set up solely to run a Ponzi scheme and "wholly dominated by persons engaged in wrongdoing," are not honest; they are

shams. *Isaiah*, 960 F.3d at 1307. That passive investors purchased shares as a form of investment in a sham corporation does not change this. Holding otherwise would simply encourage a sham corporation operating a Ponzi scheme destined to collapse to insulate itself from losing standing to pursue claims in the future by duping one "innocent" investor into holding no more than a fractional, passive interest in the sham corporation. That creates a perverse incentive and cannot be the law.

Second, and relatedly, the whole point for barring the Receiver's standing under these circumstances is obvious. "[A]ll of [the Receiver's] theories depend on some duty by [ATC UK and Manoukian] to blow the whistle on the [CFTC Defendants] by disclosing these matters to [the Receivership Entities]" at the same time that the Receivership Entities were "the robot[s] or zombie[s] of the [CFTC Defendants]." *Freeman*, 865 So. 2d at 552. "As a result, a theory based on a duty to disclose misconduct to [those entities] during a time prior to the receivership simply cannot stand because no honest person existed within the [entities] to whom such conduct could be reported." *Id.*

Ultimately, the claims the Receiver pursues may potentially belong to the Receivership Entities' "innocent" investor-creditors, but this is not (and cannot be) a class action case, and the Receiver "does not pursue such actions **on behalf of** the creditors because he does not represent those creditors." *Isaiah*, 960 F.3d at 1310. The Receiver's lack of standing requires affirmance.

### 4. Any right to amend is waived and futile.

To save his tort claims from the inevitable fate of dismissal, the Receiver asks this Court to give him an opportunity to file a ***third*** version of his complaint to allege what he calls "a wide variety of 'honest persons'" whom he never presented to the district court in the first instance or who, based on the Receiver's allegations, never "owned and controlled" the sham entities. RB at 33-38, 50. The Receiver was made well aware of his lack of standing under *Isaiah* when Manoukian (and Spotex) originally moved to dismiss. (R:41:7-11; R:42:9-15). Nonetheless, the Receiver filed the Amended Complaint in its current form, represented that it cured everything (R:36:1-2 n.1), did not formally request leave to amend by motion, and never set forth the substance or attached a copy of any proposed amendment. Under these circumstances, the Receiver's

failure to properly request an amendment forecloses this argument entirely. *See Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999) (request for leave to amend made in opposition to motion to dismiss does not preserve challenge to denial of request); *see also Fey v. US Bank, N.A.*, 733 F. App'x 1002, 1003 (11th Cir. 2018) (same).

His procedural waiver aside, the Receiver did not cure his lack of standing because he cannot, and any amendment based on the new information he presents now would be futile.

First, the Receiver takes another shot at rewriting *Isaiah* to allow his tort claims to survive dismissal if there was "any honest person" in the Receivership Entities. *See* RB at 34-35. For all the reasons above, this is an incorrect recitation of the dismissal standard *Isaiah* adopts, and it also directly conflicts with the Receiver's own recognition that the test looks at "the presence of any innocent ***decision-maker in the management*** of a corporation." RB at 34 (emphasis added) (citation omitted).

Second, the Receiver builds upon the faulty premise addressed in the preceding paragraph and argues the Receivership Entities had hundreds of innocent investors. *See* RB at 35, 37. Again, this makes no

difference. Duping innocent investors is precisely how a Ponzi scheme works, as *Freeman*, *Isaiah*, and *Perlman* plainly instruct. The presence of innocent investors did not create a basis for standing in any of those cases, and it would not do so here.

Third, the Receiver says OIG's "***current*** Register of Members" lists entities and shareholders other than the CTFC Defendants (RB at 35-36), but only conduct involving the Receivership Entities in the period ***before*** the receivership is relevant.

Fourth, the Receiver argues two of the CFTC Defendants have maintained their innocence. RB at 36-37. The Receiver does not explain why that is relevant, and he inconsistently represents both still should be subject to "civil liability to the CFTC." RB at 36. Innocent or not, this new fact does nothing to change the Receivers' many allegations regarding the control the CFTC Defendants exerted collectively.

Fifth, and finally, the Receiver states "the Receivership Entities had several officers and a material number of employees," almost all of whom "were 'honest persons.'" RB at 37. The Receiver fails to identify a single one—much less, explain their role at the Receivership Entities or

if they were the type of decision makers *Isaiah* requires to cleanse the sham and survive dismissal.

In the end, assuming one could be taken this late, no amendment will permit the Receiver to change the nature of the Receivership Entities or how they were operated, so none of the Receiver's after-the-fact justifications will ever provide a basis to grant him a third chance at sufficiently pleading standing. Accordingly, this Court should affirm in full the dismissal of the Receiver's tort claims against ATC UK and Manoukian in Counts I, II, VI, and VII.

## B. *Isaiah* Also Bars the Receiver's FUFTA Fraudulent Transfer Claims Against ATC UK (Responding to Argument (I)).

The Receiver (as well as the amicus) waste a lot of ink drawing a distinction between a receiver's standing to bring FUFTA claims, on the one hand, and common law tort claims, on the other, for the first time. *See* RB at 14-25. This is a surprising revelation on appeal. If the purported error on this point is as clear as the Receiver says it is, the Receiver should have filed a Rule 59(e) motion to bring it to the district court's attention. He did not, for reasons that remain unclear.

Nevertheless, the Receiver (and the amicus) press the argument that the district court erred in dismissing the FUFTA claims against ATC UK based on *Isaiah* when the Court's decision in *Wiand v. Lee*, 753 F.3d 1194 (11th Cir. 2014) (hereinafter, "*Lee*"), allowed his fraudulent transfer claims to move forward. But the rule *Lee* adopts regarding receiver standing is irrelevant. Regardless of the district court's reasoning, *Lee* does not require this Court to reverse the dismissal of Counts III, IV, and V—because *Isaiah* and its progeny still control the outcome of those claims, too.

First, *Perlman* extends the *Isaiah* standing bar beyond tort claims to statutory claims. There, the Court held that newly added language in the FDUTPA statute did not obviate a receiver's need to allege the corporation was not sham to have standing to pursue his or her claims against third parties. *See Perlman*, 38 F.4th at 904 (recognizing that "statute does not impact the requirement that [the receiver] must allege" separateness between the corporation and its insiders). The same is true here. Because the Receiver cannot meet this hurdle, he cannot pursue his FUFTA claims either.

Second, and independently, "[t]o prevail on a fraudulent transfer claim" under FUFTA, "a creditor must demonstrate . . . a conveyance— i.e., 'transfer'—of property which could have been applicable to the payment of the debt due." *Isaiah*, 960 F.3d at 1302 (quoting *Lee*, 753 F.3d at 1199-1200). FUFTA defines a "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset." Fla. Stat. § 726.102(14). "While the definition of transfer is broad, the statute plainly requires a plaintiff to show that the debtor either disposed of his asset or relinquished some interest in that asset." *Isaiah*, 960 F.3d at 1302.

In *Freeman*, the fraudulent company set up money market and stock/margin accounts at one of the third-party defendants, and the company placed money received by its investor customers into those accounts. 865 So. 2d at 547. The receiver sued the third-party defendant to recover for the economic losses the company suffered in connection with fraudulent transfers, but the receiver "admit[ted] that the legislature ha[d] created no statutory claim that he [could] pursue against [the] defendants." *Id.* at 552.

Likewise, in *Isaiah*, this Court held that the receiver had no FUFTA claim against the third-party bank at which corporate insiders opened accounts used as part of their Ponzi scheme because the bank deposits did not constitute a "transfer" under the statute. 960 F.3d at 1302-03. "[T]he relevant inquiry [was] . . . control." *Id.* at 1303. Because the sham corporation's Ponzi schemers could "still call upon the bank to return [the] funds on demand," they "never relinquishe[d their] interest in or control over the funds deposited," and a prima facie FUFTA claim could not be alleged. *Id.*

The same logic has extended to deposits made into brokerage trading accounts. *See, e.g.*, *McCormack Family Charitable Found. v. Fid. Brokerage Servs., LLC*, 195 A.D.3d 420, 421 (N.Y. App. Div. 2021) (deposits into brokerage account did not constitute "transfer" under state fraudulent transfer law because depositor "retained dominion and control over the assets in his account" and brokerage firms "had no discretion over the way in which the funds in the account were deployed"), *leave to appeal denied*, 37 N.Y.3d 912, 175 N.E.3d 1258 (2021).

Here, the Receiver alleges that OIG, OM, and Satellite Holdings were CPOs that solicited and received funds from investors for

investment in the Oasis Pools. (R:36:7, 17-18, 29). The Receiver describes ATC UK as an "exchange firm" for FOREX trading. (R:36:14). The Oasis Entities opened two omnibus trading accounts at ATC UK, one for each of the Oasis Pools. (R:36:31, 33-35). The CFTC Defendants then deposited their clients' investments at ATC UK in the Oasis Pools' omnibus accounts. (R:36:24-25, 33-35).

Neither ATC UK nor Manoukian, but rather the "*CFTC Defendants*[,] traded forex." (R:36:24, 34-35) (emphasis added). Although the Receiver repeats the phrase in his FUFTA claims that ATC UK "operated and controlled" the omnibus accounts (surely as a way to bypass dismissal) (R:36:49-51), he simultaneously alleges that DaCorta "was the sole authorized trader for th[e] account[s]" and the person who engaged in the "trading activities" and "losses." (R:36:4, 7, 24, 34-35, 38, 39, 49, 50, 51).[7] DeCorta, of course, is *not* ATC UK or Manoukian.

No different than the money market account provider in *Freeman*, the bank in *Isaiah*, or the brokerage firms in *McCormack*, ATC UK did not control the way in which the CTFC Defendants' investors' funds in

_____

[7] The terms of Anile's plea agreement that the Receiver reproduces in the Amended Complaint also contradicts the "control" the Receiver alleges in the FUFTA claims. (*See* R:36:3).

the Oasis Pools accounts were deployed. The Oasis Entities, through DaCorta, made the trading decisions after the money was deposited. Nothing the Receiver alleges can alter that relationship. And absent control, the money the CTFC Defendants deposited into their own Oasis Pools accounts with ATC UK do not constitute "transfers" under FUFTA as a matter of law, so this Court should affirm the dismissal with prejudice of Counts III, IV, and V against ATC UK and with prejudice.

## II. THIS COURT CAN AFFIRM THE DISMISSAL WITH PREJUDICE ON ALTERNATIVE GROUNDS.

ATC UK and Manoukian raised numerous alternative legal grounds for dismissal that the district court did not address. Independent of the reasons above, two of those alternative arguments provide additional support for affirming the district court's dismissal. First, ATC UK and Manoukian owed no duty to the Receivership Entities, and, therefore, cannot be liable for either gross or simple negligence. Second, the district court lacked personal jurisdiction over ATC UK, a U.K. entity with no connection to the United States (or Florida), and all claims against ATC UK were due to be dismissed.

**A.** **The Gross and Simple Negligence Claims Against Defendants Cannot Survive Because Defendants Owed No Duty to the Receivership Entities.**

Both the gross and simple negligence claims (Counts VI and VII) fail to—and never can—state a clear duty that ATC UK or Manoukian owed to the Receivership Entities, as a matter of law. This is fatal to the viability of those claims. *See Davis v. Dollar Rent a Car Sys.*, 909 So. 2d 297, 302 (Fla. Dist. Ct. Ap. 2005) ("The issue of duty is a question of law to be determined by the trial court as 'a minimal threshold *legal* requirement for opening the courthouse doors' before the 'more specific factual requirement' to prove causation can go to the trier of fact." (quoting *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992))).

First, Manoukian, who works for ATC UK, owed no duty to the Receivership Entities. The duty owed by an officer or director acting on behalf of a corporation is limited to that corporation. *See Kurlander v. Kaplan*, No. 8:19-cv-00644-T-02CPT, 2019 WL 3944335, at *6 (M.D. Fla. Aug. 21, 2019) (finding in the context of a shareholder suit "[a]ny fiduciary duty owed by directors 'runs . . . to the corporation'" (citing *Werbowsky v. Collomb*, 766 A.2d 123, 133 (Md. 2001))); *Bank Hapoalim (Switz.) Ltd. v. xG Tech., Inc.*, No. 8:07-cv-170-T-23MSS, 2008 WL

126583, at *3 (M.D. Fla. Jan. 10, 2008) ("A director or officer of a corporation owes a duty of care and loyalty to only the corporation and shareholders."). Manoukian worked for ATC UK, not the Receivership Entities or their underlying clients, and his conduct could not have created any personal duty owed to the Receivership Entities.

Second, the Receiver makes clear in the Amended Complaint that Oasis co-founder DaCorta was the *only* authorized trader on the Oasis Pools omnibus accounts at ATC UK and the person who engaged in the "trading activities." (R:36:4, 7, 24, 34-35, 38, 39, 49, 50, 51). Nonetheless, the Receiver alleges that ATC UK and Manoukian owed some duty to protect the investments DaCorta made, either through policing him or his trades.

But both the Florida Supreme Court and this Court "have held that [depository institutions] generally have no duty to investigate transactions made by authorized agents of the account holder." *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 947 (11th Cir. 2014); *accord Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 907 (11th Cir. 2012) ("Florida law does not require banking institutions to investigate transactions." (citing *Home Fed. Sav. & Loan Ass'n of Hollywood v. Emile*, 216 So. 2d 443, 446

(Fla. 1986))); *O'Halloran*, 350 F.3d at 1205 (banks have the "right to assume that individuals who have the legal authority to handle the entity's accounts do not misuse the entity's funds"). "Florida law 'generally accords' with the notion that 'custodian banks' [and depository banks] with no discretion to invest a customer's assets have no independent duty to supervise transactions on a customer's account . . . ." *Insight Sec., Inc. v. Deutsche Bank Tr. Co. Americas*, No. 21-12817, 2022 WL 2313980, at *4 (11th Cir. June 28, 2022) (quoting *Lamm*, 749 F.3d at 947-49 & n.7); *see also Regions Bank v. Kaplan*, No. 17-15478, 2021 WL 4852268, at *10 (11th Cir. Oct. 19, 2021) (bank "had no duty to investigate Smith's suspicious activity" (citing *Lamm*, 749 F.3d at 948 n.7)); *Curry v. TD Ameritrade, Inc.*, 662 F. App'x 769, 773 (11th Cir. 2016) (although TD America "executed . . . transactions on behalf of the parties," it "did not procure the investments . . . or recommend them" and "undertook no duty to scrutinize the financial health of the investment funds").

Here, ATC UK only facilitated trading that DaCorta exclusively directed; ATC UK never undertook a responsibility to police the soundness of those trades or the internal structures of the Oasis Entities

placing those trades, and the law creates no duty for it to do so. At a minimum, the Receiver's claims against ATC UK and Manoukian for gross and simple negligence in Counts VI and VII cannot state a claim, and this Court should affirm the dismissal of each.

**B. No Claims Against ATC UK Can Survive Because the District Court Lacked Personal Jurisdiction Over ATC UK.**

The Court also can affirm the dismissal of all claims against ATC UK for lack of personal jurisdiction. The Receiver failed to meet his burden of refuting ATC UK's clear evidence that it had no connections to the U.S. or Florida.

**1. The jurisdictional facts.**

**ATC UK is a British company.** ATC UK was incorporated in the U.K. in 2012 to serve as a broker for trading on London-based FOREX markets. (R:43-1:1).[8] ATC UK is regulated by the Financial Conduct Authority, a U.K. agency tasked with regulating the financial service industry in that country. (R:43-1:2; R:43-2:3). ATC UK maintains its

---

[8] To challenge the Receiver's jurisdictional allegations, ATC UK submitted the declarations of its Director, Jack Manoukian, and its Chief Operations Officer, Jen Claudio. (R:43-1, 43-2). ATC UK also provided the Receiver with jurisdictional discovery comprised of thousands of pages of documents and the deposition of Claudio as corporate representative. (R:58:1-2).

only business address in London, has a website with a U.K.-specific domain name, and uses a phone number with a U.K.-based country code. (R:43-2:2-3).

Jen Claudio, ATC UK's Chief Operations Officer, lives and works in the U.K. (R:43-2:1-2). Claudio makes decisions for, and manages the day-to-day operations, of ATC UK, including which vendors to engage, leasing decisions, hiring determinations, and expense decisions, and she supervises all ATC UK employees in London. (R:43-2:2; R:55-5:13, 25, 29, 30, 31).

Jack Manoukian, the managing director of ATC UK, owns ATC UK with his brother David and they reside in California, but Jack travels to the U.K. quarterly, for one-to-two weeks every time, to manage strategic concerns for the company, during which time he spends significant time with Claudio. (R:43-1:2; R:55:2, 9). While Jack handles some duties from abroad, much of the financial work with which he is involved is performed by ATC UK's accountant in London. (R:55-5:6). ATC UK's former Chief Executive Officer, Michael Mirarchi, also lived and worked in the U.K. (R:43-1:3).

Other key operational functions for ATC UK, such as compliance, banking, account management, and legal services (other than for this case), reside or take place in the U.K. (R:43-2:2-3; R:55-5:27-28, 36, 39).

ATC UK does not trade on U.S. markets. (R:43-2:3). Instead, ATC UK offers brokerage solutions for companies and individuals in non-U.S. markets. (R:43-1:1; R:43-2:2). No officers at ATC UK make trading decisions; ATC UK offers its *clients* an electronic foreign exchange service to trade on foreign-regulated markets from its London operations. (R:55-5:44).

ATC UK currently has no plans to expand its business into the U.S. or seek registration with CFTC. (R:43-2:3).

**The Oasis Pools Use of ATC UK's Services.** It is uncontroverted that two overseas Oasis Entities, OGNZ and OGBelize (*i.e.*, the Oasis Pools), opened omnibus trading accounts at ATC UK to engage in FOREX trading through foreign financial institutions. (R:43:4). The Oasis Entities used a "white label" brokerage solution provided by ATC UK that allowed the licensed entities to act as FOREX brokers for their

underlying clients.  (R:43-1:2).[9]  All of ATC UK's omnibus broker clients receive the same setup and back-office software.  (R:43-1:2).  The omnibus broker clients' underlying clients have no relationship with ATC UK.  (R:43-1:2).

OGNZ was one of two Oasis Entities that used ATC UK's services.  (R:43-2:4).  It opened an omnibus trading account with ATC UK, and, at that time, ATC UK confirmed OGNZ was a New Zealand entity registered with New Zealand authorities as a licensed broker dealer.  (R:43-2:4).  Sometime later, OGNZ became deregistered, and ATC UK requested that it become registered again or the business be moved.  (R:43-2:4).  Following that, the second of the two Oasis Entities, OGBelize, opened an omnibus trading account with ATC UK.  (R:43-2:4).  OGBelize was registered with the Belize authorities as a licensed broker dealer.  (R:43-2:4).

---

[9] A "white label" software solution refers to software provided by one company (*i.e.*, ATC UK) that other companies (*i.e.*, the Oasis Entities) rebrand to make it appear as if it were their own.  In this case, the Oasis Entities used the software to report results to their underlying clients. (R:36:25-26, 35-44). This is similar to a business using QuickBooks to manage its accounting and generate statements available to third parties with the business's name on the document.

Indisputable filings in the CFTC Action demonstrate the Oasis Entities that undertook the Ponzi scheme were owned or controlled by Anile, DaCorta, and Montie, who traded FOREX through the Oasis Entities' omnibus trading accounts using ATC UK's white label brokerage software. (R:43:5 & n.6). These principals of the Oasis Entities controlled the FOREX trading, which they conducted using the omnibus trading accounts and white label software. (R:43:5 & n.7). The principals of the Oasis entities managed their underlying clients without involvement from ATC UK. (R:43:5 & n.8).

When the Ponzi scheme was discovered, the U.K.'s National Crime Agency requested that ATC UK freeze the funds in any Oasis entities' omnibus trading accounts, which request ATC UK complied with, and this terminated any additional trading by the Oasis Entities through accounts at ATC UK. (R:43-2:4). The Receiver admits in the Amended Complaint that "approximately $2 million in cash remained in" one of the Oasis Pool accounts at ATC UK *in the U.K.* (R:36:31 n.5, 35).

## 2. The district court lacks general jurisdiction over ATC UK.

The assertion of general jurisdiction is highly circumscribed. "For an individual, the paradigm forum for the exercise of general jurisdiction

is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). With respect to a corporation, the (1) place of incorporation and (2) principal place of business are the "paradig[m] . . . bases for general jurisdiction." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (citation omitted). The Receiver admits that ATC UK is incorporated in the U.K. (R:36:8). Therefore, the only basis to assert general jurisdiction over ATC UK could be its principal place of business. But the Receiver has not met his burden of establishing that place is in the U.S. or Florida.

The Supreme Court has held that a "'principal place of business' is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities. It is the place that Courts of Appeals have called the corporation's 'nerve center.'" *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010).[10] "A corporation's 'nerve center,' usually its main headquarters, is a single place." *Id.* at 93.

---

[10] Courts regularly have applied the *Hertz* definition to personal jurisdiction analyses. *See, e.g.*, *Wright v. Stryker Corp.*, No. 2:19-cv-2877, 2020 WL 1290245 (S.D. Ohio Mar. 18, 2020).

The Receiver alleges that "California is where Manoukian and his brother, Jack, directed, controlled and coordinated ATC [UK's] activities, and, thus, California is ATC [UK's] true principal place of business, its true headquarters and its true 'nerve center,'" (R:36:9), but the jurisdictional evidence refutes this allegation and completely (and improperly) discounts ATC UK's operations in and from the U.K.

ATC UK's physical corporate headquarters is in London. (R:43-2:2). Although the Receiver alleges that the Manoukian brothers direct ATC UK's operations from California, the COO controls and coordinates the day-to-day operations of the company in London. (R:43-2:2). The managing director, Jack Manoukian, travels there quarterly to direct the long-term strategy of the company. (R:43-1:2). The London office houses the accounts management, client treasury, compliance, and operations functions. (R:43-2:2). Moreover, a London headquarters is necessary for such a business. ATC UK trades on FOREX markets using London-based financial institutions. (R:43-1:1; R:43-2:2). ATC UK is regulated by British authorities and uses a British bank. (R:43-2:2-3).

Overall, ATC UK is a British company operating in the U.K. from an office in London to assist in foreign transactions. The nature of ATC

UK's business all but dictates a principal place of business in the U.K. *See Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 365 n.21 (3d Cir. 2013) (noting that to identify the actual center of direction, control, and coordination, "we first have to acknowledge the nature of the corporation's activities, as it is difficult to locate a corporation's brain without first identifying its body. In this case, GSK Holdings' sole function is to hold assets. Therefore, the question under *Hertz* is where that activity is controlled and directed" (emphasis omitted)).

The Receiver's primary rejoinder focuses on the fact that the Manoukian brothers are "directors" and allegedly controlling shareholders of ATC UK, and they live and work in California. (R:36:8-11). The Receivers' position ignores three critical – and ultimately dispositive – points.

First, a corporation's controlling shareholders do not constitute the corporation itself. *See Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 58 (2d Cir. 2021) ("Black letter corporate law provides that a corporation and its controlling shareholder are distinct entities." (quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998))).

Second, the residence of an owner or director, even if involved in the operation of the business or listed on a corporate filing, does not establish a principal place of business. *See, e.g.*, *Wylie v. Red Bull N. Am., Inc.*, 627 F. App'x 755, 758 (11th Cir. 2015) ("The fact that the CEO, CFO, and Secretary of defendant Red Bull are listed on the form as sharing that 'Principal Office Address' does not establish Red Bull's principal place of business under the 'nerve center' test.").

And third, proper application of the nerve-center test examines "where the 'overall supervision and coordination of all functional operations' occurs." *Richey v. Auto-Owners Ins. Co.*, No. 2:19-cv-219-GMB, 2019 WL 2420401, at *2 (M.D. Ala. June 7, 2019) (citing *Cail v. Joe Ryan Ent., Inc.*, 65 F. Supp. 3d 1288, 1294 (M.D. Ala. 2014)). Just because the Manoukian brothers live in California does not mean primary decision-making is taking place anywhere other than in the U.K. *Lewis Mech. Sales, Inc. v. Union Std. Ins. Grp., LLC*, No. 2:16-CV-00496, 2017 WL 11246844 (S.D. Tex. No. 8, 2017) (noting that a corporation's principal place of business might be where its President and Director work, but that the President and Director "are not, in all instances, decisionmakers by which a corporation's principal place of business is

defined").   ATC UK has presented overwhelming evidence that operations are directed from its headquarters in the U.K.  *See* pp.48-52, *supra*.

Because ATC UK has no principal place of business in the U.S. or in Florida, the Court cannot assert general jurisdiction over it.

### 3. The district court lacks "minimum contacts" to support specific jurisdiction over ATC UK.

This Court applies a three-part test to determine whether the exercise of specific jurisdiction affords due process under a constitutional "minimum contacts" analysis:

> First, we consider whether the plaintiffs have established that their claims "arise out of or relate to" at least one of the defendant's contacts with the forum.  Second, we ask whether the plaintiffs have demonstrated that the defendant "purposefully availed" itself of the privilege of conducting activities within the forum state.  If the plaintiffs carry their burden of establishing the first two prongs, we next consider whether the defendant has "ma[de] a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice."

*Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1313 (11th Cir. 2018) (citations omitted).  None of the three is satisfied here.

**The Receiver's Claims Arise Out of U.K. Conduct.**   The claimed conduct occurred in the U.K., not the U.S.  At issue is the use

and loss of traded money by the Receivership Entities and ATC UK's alleged role in that use. These funds were held in a bank in the U.K. (R:43-2:2). The trades were facilitated through foreign-based financial institutions. (R:43-2:2). And the companies that suffered any direct loss were the Oasis Pools, which are indisputably foreign entities. The Receiver alleges these foreign trades occurred in Florida, but the evidence controverts that (and it defies all logic).

The Receiver alleges that ATC UK either (1) aided and abetted a Ponzi scheme by facilitating FOREX trading (Counts I and II), (2) fraudulently transferred receivership funds (Counts III–V), or (3) was negligent in some way to the Ponzi-scheme entities (Counts VI and VII). Regardless of cause of action, however, the relevant conduct occurred in the U.K. To establish minimum contacts, "the contact must be a 'but-for' cause of the tort, yet the causal nexus between the tortious conduct and the purposeful contact must be such that the out-of-state resident will have 'fair warning that a particular activity will subject [it] to the jurisdiction of a foreign sovereign.'" *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1222-23 (11th Cir. 2009) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *accord Waite*, 901 F.3d at 1315

(recognizing continued viability of *Oldfield* but-for test). This is a high hurdle: "the relatedness element demands a closer and more substantial causal relationship between the relevant contacts and the alleged tort." *Oldfield*, 558 F.3d at 1224.

As for the aiding and abetting claims, the conduct that allegedly helped the scheme was providing the ability to trade FOREX through omnibus accounts at ATC UK. (R:36:45-48). First, the entities trading FOREX through ATC UK were foreign entities—based in New Zealand initially and later in Belize. Second, the trading occurred outside the U.S. Accordingly, any contact between ATC UK and the Receivership Entities relevant to the aiding and abetting claims occurred outside the U.S.

As for the fraudulent transfer claims, all relevant financial transactions occurred in the U.K. For example, ATC UK banks in the U.K. (R:43-2:3). It also holds client funds in the U.K. (R:43-2:3). Accordingly, any transfer by ATC UK occurred on foreign soil in a foreign bank.

Finally, any conceivable duty ATC UK had relating to the Receivership Entities attached in the U.K. ATC UK onboarded the

foreign-based and foreign-licensed Oasis Pools through compliance functions based in the U.K. (R:43-2:3-4). And any operations related to the trading by the foreign-based Oasis Pools occurred in the U.K. through foreign financial institutions. (R:43-2:3-4). Accordingly, all FOREX trades placed were subject to the jurisdiction of a foreign regulator. (R:43-2:3-4).

Because none of the conduct at the core of the Amended Complaint occurred in the U.S., the first requirement for minimum contacts is not met, and ATC UK should not be subject to personal jurisdiction in the U.S. or in Florida.

**ATC UK Did Not Avail Itself of the Privileges of Conducting Activities in the U.S.** ATC UK targeted its business at the U.K. and other foreign markets. It did not solicit U.S. business or otherwise fulfill the requirement that it purposefully availed itself of this forum. "[The] 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, . . . or of the 'unilateral activity of another party or a third person' . . . ." *Burger King Corp.*, 471 U.S. at 475-76 (internal citations omitted). ATC UK provided the foreign-based and foreign-

licensed Oasis Entities a FOREX trading platform for use in transactions cleared by foreign financial institutions. That those foreign clients of ATC UK solicited, collected, and allegedly misused funds of their own U.S.-based clients does not mean ATC UK "create[d] a 'substantial connection' with the forum" or "'deliberately' has engaged in significant activities within [the forum]" through the clients of the Oasis entities with whom ATC UK has no relationship. *Id.* (internal citations omitted).

ATC UK never conducted or sought to conduct business subject to U.S. laws or regulators. Indeed, ATC UK is registered with and regulated by the U.K.'s Financial Conduct Authority, not the American CFTC. (R:43-2:3). ATC UK does not seek to trade FOREX in markets or methods subject to American jurisdiction; it targets trading subject to British jurisdiction. Accordingly, it has not "created 'continuing obligations' between [itself] and residents of the forum," has not "manifestly . . . availed [itself] of the privilege of conducting business there," nor has it sought to have its "activities . . . shielded by 'the benefits and protections' of the forum's laws." *Burger King Corp.*, 471 U.S. at 476. ATC UK merely provided third-party white label software and facilitated trading on non-U.S. markets by licensed, foreign broker dealers.

Indeed, ATC UK opened omnibus brokerage accounts for a New Zealand entity and a Belizean entity. While those entities may have availed themselves of the U.S., if *ATC UK* has not "purposefully directed activities inside" the U.S., it could not have availed itself of the forum regardless of what the Oasis entities did. *See Aviation One of Fla., Inc. v. Airborne Ins. Consultants (PTY) Ltd.*, 722 F. App'x 870, 882 (11th Cir. 2018). Rather, ATC UK's contacts are "too attenuated to establish 'a substantial connection with the forum State.'" *Id.* (citing *Walden v. Fiore*, 571 U.S. 277, 282 (2014)).

Nor is it sufficient to argue that ATC UK should have known that the Oasis Entities were using its software to avail themselves of the stream of commerce within the U.S. In the foundational opinion on stream-of-commerce analysis, the Supreme Court rejected the idea that a manufacturer of a part used in a larger product later sold in the U.S. had purposefully availed itself of the forum, because: "Asahi does not do business in California. It has no office, agents, employees, or property in California. It does not advertise or otherwise solicit business in California. It did not create, control, or employ the distribution system

that brought its valves to California." *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 112 (1987).

ATC UK provided a financial service in a foreign stream of commerce: the ability to manage an omnibus trading account and trade FOREX through a white label software solution. ATC UK did not create, control, or employ the distribution system that the Oasis Entities presented to U.S. customers. ATC UK, while it has American ownership, maintains the overwhelming majority of its employees, decision making, and operations in the U.K., which includes its only office where its operations occur. (R:43-2:2). And in the modern age of telework, an employee, even when that employee is also an owner, sitting in California cannot be determinative of a company registered and regulated overseas, with a business targeting foreign markets as "availing" itself of the U.S.

**The Receivership Entities' Contacts Are Irrelevant.** The only real effort the Receiver makes to connect ATC UK to the U.S. is by alleging its Ponzi-schemer contacts with the forum. (R:36:16). But a plaintiff's contacts with the forum are irrelevant in a minimum contacts analysis: "[H]owever significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the

defendant's due process rights are violated.'" *Walden*, 571 U.S. at 285

(quoting *Rush v. Savchuk*, 444 U.S. 320, 332, (1980)). Whether the Oasis

Entities or their principals committed wrongs in Florida, whether CFTC

sued Oasis and its principals in Florida, or whether the Receiver was

appointed to serve as a receiver in Florida is irrelevant. The only inquiry

is whether *ATC UK* had minimum contacts with Florida, which it did

not.

**Traditional Notions of Fair Play and Substantial Justice**

**Militate Against Jurisdiction.** ATC UK is not the only entity to

recognize it is a foreign corporation subject to foreign jurisdiction. CFTC

and DOJ both sought documents or information from ATC UK in

connection with the underlying actions against the Oasis Entities and its

principals that led to the Receiver's appointment. Yet CFTC has twice

sought documents from ATC UK and twice made its request through the

U.K.'s Financial Conduct Authority. (R:43-2:4). DOJ too has sought

information from ATC UK in connection with criminal prosecution of the

Oasis principals, but rather than ask questions of the company directly,

it relayed its questions to ATC UK's COO through the U.K.'s National

Crime Agency. (R:43-2:5). ATC UK has willingly complied with all such

requests from U.K. agencies.  The only party here refusing to respect ATC UK's jurisdiction is the Receiver.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DISMISSING WITH PREJUDICE WITHOUT LEAVE TO AMEND (RESPONDING TO ARGUMENT (IV)).

The Receiver's final argument is that the district court abused its discretion in declining to give him another opportunity to amend and file a ***third*** version of his complaint before dismissing with prejudice.  *See* RB at 49-50.  This argument is procedurally barred.

The proper method for requesting leave to amend a complaint is by filing a motion.  *See* Fed. R. Civ. P. 7(b); *see also Long*, 181 F.3d at 1279.  "A motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment." *Long*, 181 F.3d at 1279.  In *Long*, this Court held that a plaintiff who failed to follow this procedure was precluded from arguing on appeal that the district court abused its discretion in denying her leave to amend— even where, as here, "the request for leave to amend was included in the memorandum . . . filed in opposition to the motion to dismiss."  *Id.* at 1279-80.  The Court continues to adhere to this precedent.  *See, e.g., Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1277 (11th Cir. 2018)

("[W]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly.").

And the application of that precedent to this case should result in the same outcome. The Receiver filed the Amended Complaint in its current form and represented that it cured any deficiencies ATC UK and Manoukian mentioned. (R:36:1-2 n.1). Although the Receiver's oppositions to the dismissal motions summarily requested leave to amend if his arguments proved unsuccessful (R:51:23; R:55:34), the Receiver did not formally request leave to amend by motion, and he never set forth the substance or attached a copy of any proposed amendment, as required by rule. The Receiver argues that he "has not been afforded an opportunity to address the issues raised in the [o]rder" because many "were first raised by the [d]istrict [c]ourt" (RB at 50), but even assuming that were true (and it is not), the Receiver did not move to vacate the dismissal pursuant to Rule 59(e) after it was entered—much less do so by attaching a proposed amendment.

Instead, the Receiver waited until appeal to argue that the district court essentially should have permitted his rule violation and sua sponte

granted him another opportunity to amend his complaint, by presenting new allegations he never brought to the district court's attention. In *Wagner v. Daewoo Heavy Industries America Corp.*, 314 F.3d 541 (11th Cir. 2002) (en banc), this Court held that "[a] district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion . . . to amend before the district court." *Id.* at 542. Under this clear authority, the district court did not abuse its discretion in declining Receiver's belated request for an amendment.

## CONCLUSION

Based on the foregoing, ATC UK and Manoukian request the Court to affirm in full the district court's dismissal of the Amended Complaint with prejudice.

Respectfully submitted,

By: /s/ Jay A. Yagoda

<table>
<tr><td>

Gregory W. Kehoe
Christopher Torres
Christopher R. White
**GREENBERG TRAURIG, P.A.**
Bank of America Plaza, Suite 1900
101 E. Kennedy Blvd.
Tampa, Florida 33602
Telephone: 813.318.5700
kehoeg@gtlaw.com
toreesch@gtlaw.com
whitech@gltaw.com

</td><td>

Jay A. Yagoda
**GREENBERG TRAURIG, P.A.**
Wells Fargo Center, Suite 4400
333 Southeast Second Avenue
Miami, Florida 33131
Telephone: 305.579.0500
Facsimile: 305.579.0717
yagodaj@gtlaw.com
miamiappellateservice@gtlaw.com

*Counsel for Defendants-Appellees*
*ATC Brokers, Ltd. and David*
*Manoukian*

</td></tr>
</table>

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 28 because it contains 12,779 words, excluding the parts of the brief exempted by Local Rule 32-4.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word 2010 in Century Schoolbook, 14-point font.

 /s/ Jay A. Yagoda
Jay A. Yagoda

**CERTIFICATE OF SERVICE**

I certify that on May 3, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF and that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

 /s/ Jay A. Yagoda
Jay A. Yagoda